· 502 P.2d 522

**Elsie A. PRICE and Charles Gattman Price, a minor, Appellants,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut corporation, and Gary Ronald Gardner, Appellees.**

**No. 10868–PR.**

Supreme Court of Arizona,
In Banc.

Oct. 24, 1972.

Rehearing Denied Nov. 21, 1972.

Beer & Kalyna by Olgerd W. Kalyna, Phoenix, for appellants.

Renaud, Cook, Miller & Cordova, by J. Gordon Cook, Phoenix, for appellee Hartford.

Kenneth Rosengren, Phoenix, for appellee Gardner.

HAYS, Chief Justice.

This case is before us on a petition for review of a Court of Appeals opinion reported at 16 Ariz.App. 511, 494 P.2d 711 (1972). The opinion of the Court of Appeals is vacated; the judgment of the Superior Court is reversed; and the case is remanded for further proceedings consistent with this opinion.

Elsie Price, the plaintiff in this case, carried over $1,000,000.00 of automobile liability insurance with Hartford Accident and Indemnity Company, which insured her and her 17-year-old son, Charles, for "all sums" for which either of them might

become liable to pay as damages "arising out of the ownership, maintenance or use" of the automobile which gave rise to this action.

Gary Gardner was injured as a result of a drag race between Charles Price and another boy who is not involved in the instant case. Gardner sued both drivers and Mrs. Price. He charged Charles with gross negligence, wantonness, and recklessness. He charged Mrs. Price with negligent entrustment to a known careless driver and also based his action against her on allegations that she was liable for Charles' acts because he was her agent, because she agreed to the liability when she signed the papers to get her son's driving license, and because of the family purpose doctrine. He asked for $100,000.00 compensatory damages and $25,000.00 punitive damages.

Hartford provided counsel to defend the action, but informed Mrs. Price that no coverage would be afforded to her or her son for any punitive damages that might be awarded. For this reason, the Prices brought this action to obtain a judgment declaring that Hartford owes a duty under its contract, to defend both Prices, and to pay all damages, both compensatory and punitive, that might be awarded, up to the policy limits. The Prices also ask that Hartford be declared liable to reimburse them for money which they have had to pay to hire their own defense counsel. Since there were no material facts in dispute, the trial court quite properly undertook to rule on the case in a summary proceeding. It decided that: (1) Hartford owed no duty to defend Charles Price or to pay any judgment against him with regard to punitive damages, (2) Hartford owed no duty to defend Mrs. Price or pay any judgment against her, with regard to punitive damages based upon conduct in which she participated, and (3) Hartford owed Mrs. Price both the duty to defend and the duty to pay with regard to punitive damages "based on conduct in which she did not participate and which damages are based upon indirect responsibility such as

any vicarious liability." The ground of the trial court's decision was stated to be:

"Public policy of the State of Arizona precludes coverage for [punitive] damages whether it be to pay or defend, arising out of conduct participated in by an insured of such policy."

The Court of Appeals agreed with the trial court that public policy prevents payment by an insurance company of punitive damages, but disagreed with the trial court on the question of the company's duty to defend, and held that such duty extended to both compensatory and punitive damages.

The clear, unequivocal language of the policy requires the insurance company to defend the action and pay the judgment. The only issue, therefore, is whether the public policy of the state makes the insurance contract illegal insofar as it relates to punitive damages. On this issue there is a conflict of opinion among the several states, and the matter has never been determined by this court.

The arguments favoring the view that it is against public policy to allow a defendant to insure his liability for punitive damages are well expressed in Northwestern National Casualty Co. v. McNulty, 307 F. 2d 432, in which the court used the following language:

"Considering the theory of punitive damages as punitory and as a deterrent and accepting as common knowledge the fact that death and injury by automobile is a problem far from solved by traffic regulations and criminal prosecutions, it appears to us that there are especially strong public policy reasons for not allowing socially irresponsible automobile drivers to escape the element of personal punishment in punitive damages when they are guilty of reckless slaughter or maiming on the highway. . . . The delinquent driver must not be allowed to receive a windfall at the expense of the purchasers of insurance, transferring his responsibility for punitive damages to

the very people—the driving public—to whom he is a menace.

\* \* \* \* \* \*

"If [the wrongdoer] were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured."

 These arguments, at first blush, seem to have merit, but a careful analysis of them reveals several weaknesses. First, even though a driver is insured for punitive damages he cannot engage in wanton conduct with impunity. In the instant case, drag racing would subject him to criminal penalties. His insurance rates would soar. Hartford argues that the assigned risk provisions of the Arizona system would prevent them from soaring. However, the assigned risk procedure would not enable him to procure more than the minimum coverage of $15,000/30,000, and in order to replace his $1,000,000.00 limits, his premium would be tremendous. Second, Hartford has voluntarily covered its insured's liability for punitive damages, and since its premiums were based on its exposure, it may be presumed that holding it liable for what it has promised to pay would not result in additional burdens on the driving public. Third, the criminal penalties include possible loss of the driver's license and compulsory attendance at the traffic school. Fourth, punitive damages are not only designed to punish the offender but are also designed to serve as a deterrent to others. Since it is common

knowledge that the vast majority of drivers do not carry million dollar liability policies, the possibility that punitive damages will exceed their policy limits will exercise a deterrent effect on them. Fifth, there is no evidence that those states which deny coverage have accomplished any appreciable effect on the slaughter on their highways. Sixth, the state of Arizona has more than one public policy. Such policy appears in many fields. One such public policy is that an insurance company which admittedly took a premium for covering all liability for damages, should honor its obligation.

One of the leading cases holding that coverage of punitive damages is not against public policy is Lazenby v. Universal Underwriters Ins. Co., 214 Tenn. 639, 383 S.W.2d 1. It quotes at length from McNulty, *supra,* but nevertheless comes to the opposite conclusion. It would serve no useful purpose to cite the numerous cases on each side of this question. They are gathered in 20 A.L.R.3d 343, and in 7 Appleman's Insurance Law and Practice, § 4312. Much has also been written on the subject in various law reviews.

We are most impressed with the following language from Appleman, *op. cit.* pp. 132–136:

"[I]t is clear that the average insured contemplates protection against claims of any character caused by his operation of an automobile, not intentionally inflicted. When so many states have guest statutes in which the test of liability is made to depend upon wilful and wanton conduct, or when courts, in an effort to get away from contributory negligence of the plaintiff, permit a jury to find a defendant guilty of wilful and wanton conduct where the acts would clearly not fall within the common law definitions of those terms, the insured expects, and rightfully so, that his liability under those circumstances will be protected by his automobile liability policy.

\* \* \* \* \* \*

**488**

"Of course, a policy could expressly exclude liability arising from wilful and wanton acts. . . . The author does not expect many decisions upon [such] clauses . . . because as soon as the public became educated by competing agents to the limitations upon that policy, the public would refuse to accept it, and it would be unsaleable."

On page 86 of the cumulative supplement to volume 7 of Appleman's work, we find the following:

"In any event a court should not aid an insurer which fails to exclude liability for punitive damages. Surely there is nothing in the insuring clause that would forewarn an insured that such was to be the intent of the parties."

 It is our holding that the premium has been paid and accepted and the protection has been tendered, and that under the circumstances public policy would be best served by requiring the insurance company to honor its obligation.

Reversed and remanded to the Superior Court for further proceedings consistent with this opinion.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.