782 P.2d 727

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,**
Plaintiff–Appellant,

v.

**Patricia WILSON and John Doe Wilson, her husband; and Michael Wilson, son of Patricia Wilson, Defendants–Appellees.**

No. CV–89–0071–PR.

Supreme Court of Arizona, En Banc.

Oct. 12, 1989.

Jones, Skelton & Hochuli by Ronald W. Collett and Kevin D. Neal, Phoenix, for plaintiff-appellant.

Kunz & Waugh, Ltd. by Richard M. Waugh, Phoenix, for defendants-appellees.

Tully & Wezelman, P.C. by John L. Tully, Tucson, for amicus curiae Arizona Trial Lawyers Association.

FELDMAN, Vice Chief Justice.

Michael Wilson (Wilson) petitions us to review a court of appeals' opinion holding the underinsured motorist provisions (UIM) in his automobile policy did not cover a punitive damage award. *See State Farm Mut. Auto. Ins. Co. v. Wilson,* 162 Ariz. 247, 782 P.2d 723 (Ct.App.1989). Wilson claims a conflict in Arizona law exists on this issue because division two of the court of appeals had previously construed an identical clause in an uninsured motorist (UM) provision to extend such coverage. *See State Farm Fire & Cas. Co. v. Wise,* 150 Ariz. 16, 721 P.2d 674 (Ct.App.1986). We granted review to resolve the conflict. *See* Rule 23, Ariz.R.Civ.App.P., 17B A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

I. FACTS AND PROCEDURAL HISTORY

The facts are undisputed. On June 12, 1983, Wilson was injured in a collision with a drunk driver. He sued the driver and obtained a judgment for $5,000 compensatory and $20,000 punitive damages. The driver's insurance company paid the compensatory damages award but refused to pay punitive damages, claiming the policy expressly excluded punitive damages from its liability coverage.

Wilson then demanded that State Farm Mutual Automobile Insurance Co. (State Farm), his insurer, pay the punitive damage award under the UIM coverage contained in his policy. State Farm sought

declaratory relief, requesting that the court find its policy did not provide such coverage.

The UIM endorsement provides:

We will pay damages for *bodily injury* *an insured* is legally entitled to collect from the owner or driver of an *underinsured vehicle.* The *bodily injury* must be caused by accident arising out of the operation, maintenance, or use of an *underinsured motor vehicle.*

(Emphasis in original).

The policy states bodily injury "means bodily injury to a *person* and sickness, disease or death which results from it." (Emphasis in original). The policy also contains the following provisions:

Deciding Fault and Amount

Two questions must be decided by agreement between the *insured* and us:

1. Is the *insured* legally entitled to collect damages from the owner or driver of an *underinsured motor vehicle; and*

2. If so, in what amount?

Payment of Any Amount Due

We will pay any amount due:

1. *to the insured;* ...

(Emphasis in original). A separate section of the policy specifically outlines when UIM coverage does not apply; there is no exclusion for payment of punitive damages.

Thus, the applicable insuring portion of the policy covers only damages "for bodily injury," while the provision governing damage assessment provides for payment of all damages that may be due the insured. The words used do, indeed, present us with two apparently reasonable but conflicting interpretations. *See* Restatement (Second) of Contracts §§ 207 and 208. Wilson argued that the ambiguity in the policy language required judgment against State Farm and, furthermore, that *Wise* controlled. On cross-motions for summary judgment, the trial court ruled that State Farm, Wilson's insurer, was liable to pay the punitive damages award assessed against the tort-

feasor. State Farm appealed and the court of appeals reversed.

Having granted the petition for review, we must thus decide whether coverage for punitive damages assessed against the tortfeasor is within the protection afforded by Wilson's UIM coverage.

## II. DISCUSSION

### A. Court of Appeals Decision

Viewing ambiguity as the dispositive question, the court of appeals found the UIM policy unambiguous and stated that it therefore must "be construed according to its ordinary meaning." 162 Ariz. at 248, 782 P.2d at 724. The court thus determined the policy provision insuring against "damages for bodily injury" did not include punitive damages because a lay person would not so construe it. The court. discounted Wilson's argument that the clause was ambiguous when compared to other language in State Farm's policy. *Id.*

The court acknowledged that when faced with an almost identical clause, division two of the court of appeals had come to a different conclusion in *Wise.* In *Wise,* division two held that arbitrators were correct to award punitive damages as part of a UM claim in the absence of an express exclusion. 150 Ariz. at 17, 721 P.2d at 675. In the present case, the court did not find *Wise* controlling because it believed division two improperly interpreted *Price v. Hartford Accident & Indem. Co.,* 108 Ariz. 485, 502 P.2d 522 (1972)[1] as authority for the proposition that an insurer's failure to specifically exclude punitive damages was tantamount to an agreement to pay them under all circumstances. 162 Ariz. at 248, 782 P.2d at 724.

On review, Wilson urges us to hold that coverage exists because the policy is ambiguous and because such a construction would fulfill the expectations of the consumer. Given the nature of the insurance

---

1. In *Price,* this court examined the scope of coverage provided by a general liability policy that provided it would pay "all sums [the insured] might become liable to pay as damages

'arising out of the ownership, maintenance or use' of [his] automobile." 108 Ariz. at 485–86, 502 P.2d at 522–23.

industry, we are well aware many of its customers expect maximum return for the premium dollar. In that light, the coverage in question might be expected. To be enforceable, however, the specific expectation must be *reasonable. See Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 389-90, 682 P.2d 388, 394-95 (1984). In interpreting the language of the agreement in question to determine if Wilson had a reasonable expectation of coverage for punitive damages, we must examine the purpose of the clause in question, public policy considerations, and the purpose of the transaction as a whole. *Arizona Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 135, 735 P.2d 451, 457 (1987). We proceed to do so, looking first at public policy as evidenced by legislative enactments and relevant case law.

### B. Interpretation of the Policy in Light of Statutory Law and Other Public Policy Considerations

Because both UM and UIM insurance are creatures of statute (*see* A.R.S. § 20-259.01), we turn first to consider whether the legislature has required the coverage in question or whether the legislative goals would be served by resolving any doubt in policy language in favor of coverage.

#### 1. *Statutory Genesis*

State Farm offered UIM coverage to comply with the requirements of Arizona law. *See* Petition for Review, App. B (State Farm Mutual Car Policy, "New Law Adds Coverage W To Your Policy"). UM coverage was similarly offered in response to statutory enactments. Thus, we analyze the purpose of the coverages provided by the contract with the statutory mandate in mind. *Jenkins v. Mayflower Ins. Exch.*, 93 Ariz. 287, 291, 380 P.2d 145, 148 (1963) (statutory omnibus clause is part of every motor vehicle liability policy); *see also Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 134 S.E.2d 206, 209 (1964) (under South

Carolina law, all statutes relating to the insurance contract are parts of the contract).

#### a. The Legislative History of UIM

The legislature adopted the Financial Responsibility Act (currently, the Safety Responsibility Act) in 1951. *See* A.R.S. §§ 28-1101 to 28-1225, 1951 Ariz.Sess. Laws ch. 122. In requiring all owners or operators of motor vehicles in Arizona to obtain liability insurance coverage, the legislature sought to protect drivers in the state against losses engendered by financially irresponsible owners or operators of motor vehicles. *Id.; see also Cassel v. Schacht*, 140 Ariz. 495, 683 P.2d 294 (1984) (citing *Schecter v. Killingsworth*, 93 Ariz. 273, 380 P.2d 136 (1963) and *Jenkins* )). In spite of the act's mandate, many automobile owners failed to purchase insurance. Therefore in 1965, UM coverage became the subject of legislation.[2] Bills were introduced in both the house and senate to require vehicle liability policies to provide coverage for injuries resulting from accidents with uninsured or unknown vehicles. *See* SB 42, Twenty-seventh Legislature (1965); Minutes of Meeting of Committee on Banking, Insurance and Corporations, March 16, 1965; Minutes of Meeting of Committee on County Affairs, March 23, 1965.

As enacted, the statute provided that insurers offer protection to persons "legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom." *See* Laws 1965, ch. 34. The insured had the right to reject UM coverage until 1972 when the legislature made such coverage mandatory. *See* Laws 1972, ch. 157.

In 1981, the legislature perceived inadequacies in UM insurance. *See* A. Widiss, UNINSURED AND UNDERINSURED MOTORIST INSURANCE § 31.4 (2d ed. 1987) (UIM coverage developed in response to the public concern about the shortcom-

---

**2.** Forty-nine states have legislation that establishes various types of requirements regarding UM coverage. A. Widiss, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, § 1.12 (2d ed. 1987).

ings of UM insurance, which only applied to accidents caused by uninsured motorists). Serious injuries are often caused by insured drivers with inadequate liability limits. Therefore, there was an obvious need for first party coverage to provide a source of recovery for such accidents. *Id.* A bill introduced in the Arizona house required auto liability insurance carriers to offer UIM coverage. HB 2129. As enacted, it stated that insurers must provide:

> coverage for a person if the sum of the limits of liability under all bodily injury or death liability bonds and liability insurance policies applicable at the time of the accident is less than the total damages for bodily injury or death resulting from the accident. To the extent that the total damages exceed the total applicable liability limits, underinsurance motorist coverage provided in … this section is applicable to the difference.

Laws 1981, ch. 224, § 1.

After various changes,[3] the statute in effect at the time of the accident in this case directed that any motor vehicle policy issued in this state include UM coverage. A.R.S. § 20–259.01(A). The insurer was also required to make UIM coverage available to the same limits as the liability coverage; however, the insured had the option of refusing UIM coverage. A.R.S. § 20–259.01(C). The insurer had the right to subrogate against either an uninsured or underinsured motorist. A.R.S. § 20–259.01(G).[4]

**b. Legislative Objectives**

Mandatory UM insurance is a reflection of public policy favoring indemnification of victims of negligent, financially irresponsible motorists. *Calvert v. Farmers Ins. Co.,* 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985);[5] *see also* Widiss, *supra,* § 2.3. Obviously, mandatory offerings of UIM coverage, when accepted by the insured, are based on the same public policy. *See Higgins v. Fireman's Fund Ins. Co.,* 160 Ariz. 20, 22, 770 P.2d 324, 326 (1989).

The legislature has amended A.R.S. § 20–259.01 repeatedly to expand its scope. *Calvert,* 144 Ariz. at 297, 697 P.2d at 690. Nonetheless, the statute does not direct that UM or UIM coverages extend to punitive damages assessed against the tortfeasor. Moreover, our review of the minutes of the various committees in which the bills preceding the enactment of A.R.S. § 20–259.01 were considered has not shed any light on specific legislative intent regarding coverage for punitive damages.[6] We must be guided, therefore, by the legislative objectives in enacting the statute. *See Cassel.* In so doing, we look to the policy behind the statute and the evil it was designed to remedy. *Calvert,* 144 Ariz. at 294, 697 P.2d at 687.

We believe the legislative objective in this case is narrower in scope than in the

---

**3.** The 1981 legislation deemed that UIM coverage was mandatory. During the same session, the legislature permitted insurers who made payments for damages to insureds under the UM requirements of the act to subrogate and sue for reimbursement of the total payments made in the name of the insured against any uninsured motorist responsible for the damages to the insured. Laws 1981, ch. 224, § 1. The following year, the statute was amended so that the insured could elect to reject UIM coverage. Laws 1982, ch. 298, § 1. The act specified that UIM coverage was separate and distinct from UM coverage. Subrogation was permitted against underinsured motorists. In 1986, the statute was again amended to remove the insurer's right to subrogation against an underinsured motorist for reimbursement paid to an insured under the insured's UIM coverage. Laws 1986, ch. 184, § 1. Supporters of the amendments stated that collections for underinsured motorists were "very insignificant." *See* Minutes of Meeting of Committee on Banking and Insurance, March 5, 1986.

**4.** The only change effected after the accident was that the insurer no longer has a right of subrogation against an underinsured motorist. A.R.S. § 20–259.01(G).

**5.** In *Calvert,* we held that an exclusion denying coverage to an insured injured by an uninsured motorist while the insured was occupying a vehicle he owned but that was not listed in his policy was invalid as contrary to the coverage mandated by the UM act.

**6.** We similarly determined that legislative intent with respect to coverage for punitive damages pursuant to the Safety Responsibility Act was impossible to ascertain. *Cassel,* 140 Ariz. at 496, 683 P.2d at 295.

general liability context. Neither the UM nor the UIM statute purports to afford as broad protection as the Safety Responsibility Act. The UM and the UIM statutes require coverage only "for bodily injury or death," whereas the Safety Responsibility Act also requires coverage for property damage. *Compare* A.R.S. § 20–259.01(B) and (C) *with* § 28–1170(B)(2)(c). Furthermore, the Safety Responsibility Act serves the dual purpose of protecting the general public from the insured and protecting the insured from liability for his own acts, while the UM and UIM Act only compels protection for injuries the insured sustains from the acts of others. *Employers Mut. Cas. Co. v. McKeon,* 159 Ariz. 111, 114, 765 P.2d 513, 516 (1988).

Unlike liability coverages, therefore, UM and UIM coverages prescribed in this state do not even compensate the victim for the total loss (property as well as personal injury) suffered. *Compare* A.R.S. § 20–259.01 *with* A.R.S. § 28–1170(B)(2)(c). Rather, they are "gap fillers" permitting insureds to provide themselves with a source of compensation for bodily injuries sustained as a result of the negligence of a financially irresponsible or inadequately insured driver. *Calvert,* 144 Ariz. at 295, 697 P.2d at 688.

Having determined as best we can the legislative objective—to provide a source of compensation for bodily injury sustained by the insured—we must consider whether punitive damage payments are within the legislature's goals. To do so, we must examine the role such awards play in our judicial system.

### 2. *Who Should Pay Punitive Damages?*

Tort law has adopted the idea of punishment that underlies criminal law in its imposition of punitive damages for a defendant's wrongdoing. PROSSER AND KEETON ON THE LAW OF TORTS § 2 (5th ed. 1984); *see also Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 497, 733 P.2d 1073, 1080 (1987); *Rawlings v. Apodaca,* 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986) (punitive damages available when defen-

dant's wrongful conduct was guided by "evil motives"). Thus, courts permit such awards to punish the defendant and to deter others from following the defendant's example. PROSSER AND KEETON § 2; *Cassel,* 140 Ariz. at 496, 683 P.2d at 295. Punitive damages are awarded to the plaintiff over and above the full compensation he receives for his injuries. *Id.* To the plaintiff, punitive damages are therefore a non-compensatory award based on public policy concerns irrelevant to compensation.

In appropriate cases, assessment of punitive damages to be paid by the tortfeasor fulfills the social policy of deterrence that underlies such awards. Liability insurance coverage *for that tortfeasor* is permissible because payment of such damages by the tortfeasor's insurer may pass the ultimate costs of the punitive damage award to the tortfeasor or others in similar situations. *See Price,* 108 Ariz. at 487, 502 P.2d at 524. Obviously, the payment of punitive damages by the *victim's* insurance company is counter-productive. The burden of payment falls neither on the tortfeasor who was to be punished nor on the insurer who contracted to assume the tortfeasor's responsibility and may have the ability to pass the cost to the guilty party.

### 3. *Resolution of Legislative Issues*

We have considered the goals and social policies that underlie the legislative requirement that UM coverage be provided and UIM coverage offered—to provide protection to the insured for his bodily injury. We have also considered the social policy underlying punitive damage awards—to punish the tortfeasor and deter others. These considerations provide no basis to conclude that the statutes or legislative policy underlying UM and UIM coverage require or should be read to require the victim's UM or UIM insurer to pay punitive damage awards assessed to punish the tortfeasor rather than to compensate the victim for his injuries. When faced with conflicting, reasonable interpretations of a contract, the court should adopt the interpretation that furthers public policy.

*Helme,* 153 Ariz. at 135, 735 P.2d at 457; Restatement (Second) of Contracts § 207. Public policy does not militate in favor of a construction that the victim's insurer pay punitive damages assessed against the tortfeasor.

### C. Interpretation of the Contract in Light of the Nature of the Transaction as a Whole

We turn then to consider whether, regardless of legislative requirements and goals, State Farm has undertaken to include such coverage in its contract with Wilson. It is here, citing *Darner* and raising the flag of ambiguity, that Wilson makes his most forceful argument. Indeed, we have held that if an insurer chooses to provide coverage for punitive damage awards, the law will not prevent it from so doing.[7] *Price.*

#### 1. *Darner*

This court has long stood for the proposition that, in buying insurance, consumers are entitled to get what they pay for. *Darner,* 140 Ariz. at 391–92, 682 P.2d at 396–97. We do not retreat from our belief that the fine print of the mass transaction boilerplate which the purchaser neither reads, understands, nor is expected to understand should be allowed to upset the "dickered deal" or destroy the objectives of the transaction. *State Farm Mut. Auto. Ins. Co. v. Bogart,* 149 Ariz. 145, 151, 717 P.2d 449, 555 (1986); *Darner,* 140 Ariz. at 393, 682 P.2d at 398.

In the present case, however, the wording of the insuring clause is intended to provide a source of compensation for the victim/insured's bodily injuries. The coverage is designed and offered for that purpose. The insurer's undertaking at the beginning of the policy indicates no more than protection of the insured from bodily injury damages. No fine print exclusion is raised to take away that which the policy was intended to offer; the policy was never sold or intended to grant the coverage now

claimed. *Cf. Higgins, Calvert.* Nothing in *Darner* or its progeny supports the proposition that an insured buying protection against bodily injury would have any reason to also expect coverage for non-compensatory damages assessed to punish the tortfeasor rather than compensate the *victim.*

The insured buying UIM coverage has a reasonable expectation that he will get what he pays for: coverage for bodily injuries caused by underinsured motorists. Nothing in the nature of the transaction engenders an expectation that absent an express undertaking by the insurer, he will also get coverage for punitive damages assessed against the tortfeasor. The *Darner* doctrine protects only the reasonable expectations engendered by the nature of the transaction, and in this case militates against a finding of coverage. *See* 140 Ariz. at 389–90, 682 P.2d at 394–95.

#### 2. *Ambiguity*

We come then to the question of ambiguity. Indeed, because two divisions of our court of appeals have reached diametrically opposite conclusions based on essentially identical wording, prior authority requires us to conclude that the clause must be ambiguous. *See Federal Ins. Co. v. P.A.T. Homes, Inc.,* 113 Ariz. 136, 138–39, 547 P.2d 1050, 1052–53 (1976) (whenever two courts have disagreed on interpretation of an insurance policy, it must be ambiguous and must be interpreted in favor of the insured). One might also argue in the case at bar that the grant of insurance "for bodily injury" in the UIM coverage, compared to the promise to pay "any amount due to the insured" in the ascertainment clause, and the use of the term "because of bodily damages" in the general liability provisions of the policy create apparent ambiguity. Our inquiry thus must be directed to whether such ambiguity actually exists and whether we should therefore construe the clause against the insurer.

7. The parties have not raised and we do not consider whether a contractual agreement by the victim's insurer for payment of punitive damages imposed on the tortfeasor would be void as against public policy.

*See* Restatement (Second) of Contracts §§ 206 and 207.[8]

We thus come to the very essence of the ambiguity doctrine and its place in our interpretation of the contract. For some reason, before courts interpret contractual provisions they feel constrained to declare that the provisions are ambiguous. *See Transamerica Ins. Group v. Meere,* 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984). Once a court finds the requisite ambiguity, it is then compelled to construe the provision against the insurer. *Id.* If, however, the court finds the clause unambiguous, it construes it "according to its ordinary meaning" as the court of appeals did in this case. *See* 162 Ariz. at 248, 782 P.2d at 724.[9]

We marvel, as Corbin did nearly forty years ago, that judges insist upon applying such rules "innumerable times, sometimes to apply them though justice weeps at her own blindness, sometimes to avoid them by making fine and specious distinctions, sometimes merely to state them with respect while disregarding them, and sometimes to voice criticism and disapproval." 3 A. Corbin, CONTRACTS § 536 (2d ed. 1960). We prefer to adopt a rule of common sense and have attempted to do so on numerous occasions. *See generally Helme, Meere, Darner.*

We once again decline "to hold that an unexpected, unknown ambiguity in a clause which the parties did not negotiate ... should permit them to show the true [meaning] of the agreement, but that the lack of such an ambiguity prevents them from so doing." *Darner,* 140 Ariz. at 389, 682 P.2d at 394. Thus, we reiterate, the rule in Arizona is that we construe a clause

subject to different interpretations by examining the language of the clause, public policy considerations, and the purpose of the transaction as a whole. *Helme,* 153 Ariz. at 135, 735 P.2d at 457.

We emphasize that in so doing, we do not ignore the ambiguity question in evaluating the viability of Wilson's claim that his policy covers punitive damages by providing for payment of "any amount due to the insured." *See, e.g., Security Ins. Co. v. Andersen,* 158 Ariz. 426, 763 P.2d 246 (1988); *Darner,* 140 Ariz. at 390, 682 P.2d at 394; Restatement §§ 206 and 207. However, when a question of interpretation arises, we are not compelled in every case of apparent ambiguity to blindly follow the interpretation least favorable to the insurer. The policy language is essential to our analysis, but neither language nor apparent ambiguity alone is dispositive without first addressing questions as to the requirements established by the legislature, public policy required to fulfill legislative goals, and the dominant purpose of the transaction. *See Helme.* The existence of ambiguity that militates in favor of construction against the drafter can be determined only after these questions have been answered.

We agree with the court of appeals that *Price* is distinguishable. Moreover, it foretold, over fifteen years ago, the rule we adopt today. In *Price* we held that any public policy considerations militating against an insurer providing coverage for punitive damages were outweighed by the public policy "that an insurance company which admittedly took a premium for [indemnifying against] *all liability for damages,* should honor its obligation." 108

**8.** Section 206 states:

In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is *generally* preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.

(Emphasis added.) Section 207 states:

In choosing among the reasonable meanings of a promise or agreement or a term thereof a meaning that serves the public interest is generally preferred.

**9.** This case well illustrates the problems inherent in the so-called "plain meaning" rule. Two clauses of this policy are drawn into question. Each has a plain meaning, but their plain meanings are in conflict. To hold there is no ambiguity is to ignore that of the eight Arizona judges who have so far considered the question, four find one plain meaning and four another. A similar problem exists in other states. *See* part D, *infra.* The problem is that the ordinary meaning of the words used in two different sections of the policy permit two alternate, reasonable interpretations.

Ariz. at 487, 502 P.2d at 524 (emphasis added). We held, therefore, that an express exclusion was required to eliminate coverage for punitive damages from general liability insurance because the insured was personally at risk if his liability insurance did not cover those damages. The essence of the transaction was the insured's purchase of indemnification against all damages for which he might be held liable.[10]

General liability insurance is separate and distinct from the first party coverage provided by either UM or UIM insurance. The insured in the UM or UIM context is not personally liable to pay punitive damages; therefore, the dominant purpose of the transaction would not be defeated if coverage were not conferred absent express statement in the policy. Our direction today is determined by the different considerations that come into play when the insured purchases UM and UIM coverage to protect himself and his family from *loss by reason of bodily injury* inflicted by uninsured or underinsured tortfeasors. That is what Wilson bought and State Farm sold. Wilson is entitled to get neither less nor more than that. *See McKeon,* 159 Ariz. at 115, 765 P.2d at 517.

■ We conclude, therefore, that although the language of the policy presents conflicting reasonable interpretations, we are not thereby automatically constrained to construe it against the insurer in this case. The determination that an ambiguity must be construed against the insurer

comes in this case, as we believe it must in all cases, at the *end* of our inquiry, not at the beginning. Considerations of legislative goals, social policy, and examination of the transaction as a whole, including the reasonable expectations of the insured, may indicate, as here, that we should not automatically construe a clause susceptible to various interpretations in favor of the insured. To the extent that *Federal Insurance v. P.A.T. Homes,* 113 Ariz. 136, 547 P.2d 1050 (1976), deviates from this rule, it is disapproved. In this case nothing in the nature of the transaction or the dickered deal would lead the consumer to expect coverage. Thus, there is no reason to adopt the construction favoring coverage when such construction actually does violence to legislative goals, social policy, and the nature of the transaction as a whole.

## D. Authority from Other Jurisdictions

We are cognizant that a conflict of authority exists in cases from other jurisdictions. *See* Annotation, *Punitive Damages as Within Coverage of Uninsured or Underinsured Motorist Insurance,* 54 A.L.R.4th 1186 (1987 and 1988 Supp.). In construing a UM statute that required the insurer to pay all sums which the insured was legally entitled to recover, the Virginia Supreme Court held the insured was legally entitled to recover punitive damages. *Lipscombe v. Security Ins. Co.,* 213 Va. 81, 189 S.E.2d 320 (1972). The court reasoned that because the UM statute permitted the insurer to be subrogated to the rights of the insured, the burden would eventually

---

**10.** In so holding, we quoted from Appleman's treatise on insurance as follows:

[I]t is clear that the average insured contemplates protection against claims of any character caused by his operation of an automobile, not intentionally inflicted. When so many states have guest statutes in which the test of liability is made to depend upon wilful and wanton conduct, or when courts, in an effort to get away from contributory negligence of the plaintiff, permit a jury to find a defendant guilty of wilful and wanton conduct where the acts would clearly not fall within the common law definitions of those terms, the insured expects, and rightfully so, that his liability under those circumstances will be protected by his automobile liability policy....

Of course, a policy would expressly exclude liability arising from wilful and wanton acts.... The author does not expect many decisions upon [such] clauses ... because as soon as the public became educated by competing agents to the limitations upon that policy, the public would refuse to accept it, and it would be unsaleable....
In any event a court should not aid [a liability] insurer which fails to exclude liability for punitive damages. Surely there is nothing in the insuring clause [typically indemnifying against "all damages"] that would forewarn an insured that such was to be the intent of the parties.
*Price,* 108 Ariz. at 487–88, 502 P.2d at 524–25 (quoting 7 Appleman, INSURANCE LAW AND PRACTICE, § 4312).

fall on the tortfeasor and therefore would not contravene the public policy of the state.

We do not find *Lipscombe*'s reasoning persuasive. Although theoretically State Farm had the right of recovery against the tortfeasor, we do not believe the subrogation right to be dispositive. The right of subrogation no longer exists against underinsured motorists because such efforts were seldom successful. *See* Minutes of Meeting of Committee on Banking and Insurance, March 5, 1986, *supra* note 3. No reason exists for us to believe that efforts against uninsured motorists would be more so. *See* Note, *Uninsured Motorist Insurance Now Covers Punitive Damages— Hutchinson v. J. Height,* 19 Akron L.Rev. 325, 328 n. 27 (1985) (insurers' efforts yield results no better than 1.5 percent collection rate); *State Farm Mut. Auto Ins. Co. v. Mendenhall,* 164 Ill.App.3d 58, 115 Ill.Dec. 139, 142, 517 N.E.2d 341, 344 (1987) (possibility of subrogation is "wild-eye conjecture which lacks practical application"); *Braley*

*v. Berkshire Mut. Ins. Co.,* 440 A.2d 359, 363 (Me.1982) ("probability of some recovery is negligble" and impossible if uninsured driver is unknown). We do not believe that we should interpret the policy to provide coverage because of unsupported speculation that the subrogated insurer will be able to recover from the underinsured motorist.[11]

We find the better reasoned cases agree that UM coverage does not apply to punitive damages. *See, e.g., Laird,* 134 S.E.2d 206 (South Carolina court in construing a broad UM provision that promised to pay "all sums" the insured was entitled to recover so held).[12] In *Laird,* the South Carolina court noted that automobile insurance statutes in its state distinguished between liability coverage, which required payment of all damages, and UM coverage that was more limited.[13]

Many courts that have considered the issue have reached the same conclusion as *Laird.*[14] Widiss, in commenting on *Laird,*

**11.** We find the reasoning of other cases in which courts held the insurer liable for punitive damages inapplicable or unpersuasive as well. *See Stewart v. State Farm Mut. Auto. Ins. Co.,* 104 N.M. 744, 726 P.2d 1374 (1986) (legislature intended that insured receive punitive damage award and court will strictly construe provision that promises to pay "all sums" against the insurer); *Hutchinson v. J.C. Penney Cas. Ins. Co.,* 17 Ohio St.3d 195, 17 O.B.R. 432, 478 N.E.2d 1000 (1985) (construing ambiguous clause against insurer and invoking insured's right to subrogation as justifying payment of punitive damages); *Cuppett v. Grange Mut. Cos.,* 12 Ohio App.3d 82, 12 O.B.R. 281, 466 N.E.2d 180 (1983) (holding an insurer was liable for punitive damages under a UM provision that required the insurer to pay all sums for bodily injury because the insurer clearly and unambiguously contracted to do so); *Mullins v. Miller,* 683 S.W.2d 669 (Tenn.1984) (citing fact that statute was broadened to include coverage for property damage and thus concluding legislature intended to equate UM coverage with liability coverages); *Home Indem. Co. v. Tyler,* 522 S.W.2d 594 (Tex.Civ.App.1975) (equating UM with general liability coverage and dismissing public policy considerations that might militate against indemnifying a wrongdoer).

**12.** The provision stated:
INSURANCE AGREEMENT
1. Damages for Bodily Injury and Property Damage Caused by Uninsured Automobiles. To pay all sums which the Insured or his legal

representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of: (a) bodily injury, sickness or disease including death, resulting therefrom hereinafter called "bodily injury" sustained by the Insured.
*Laird,* 134 S.E.2d at 207.

**13.** Subsequent legislation reversed the result reached in South Carolina, however, and provided that "[t]he term 'damages' shall include both actual and punitive damages." South Carolina Code § 56–9–810(4) (1976).

**14.** *See California State Auto. Ass'n Inter-Insurance v. Carter,* 164 Cal.App.3d 257, 210 Cal.Rptr. 140 (1985) (statutory language and purpose of UM coverage do not encompass recovery of punitive damages); *Suarez v. Aguiar,* 351 So.2d 1086 (Fla.App.1977), *cert. denied,* 359 So.2d 1210 (Fla.1979); *State Farm Mut. Ins. Co. v. Kuharik,* 179 Ga.App. 568, 347 S.E.2d 281 (1986) (punitive damages not properly awarded pursuant to UM coverage when loss caused by unknown driver); *Mendenhall,* 115 Ill.Dec. 139, 517 N.E.2d 341 (purpose of UM coverage is not to punish insured's insurance company, rather is compensatory and not punitive); *Braley,* 440 A.2d at 362 (policy reflected a statutory UM endorsement, protected an insured only against actual losses and therefore "all sums for bodily injury" covered only compensatory and not punitive damages); *State Farm Mut. Auto Ins. Co. v. Daughdrill,* 474 So.2d 1048 (Miss.1985) (statute mandated coverage only for actual damages

noted that in the absence of a broad statutory mandate, an interpretation that punitive damages were not within the scope of coverage seemed proper. WIDISS, *supra,* § 12.6. We agree.

### III. CONCLUSION

█ Insurers must comply with statutes governing automobile insurance in providing UM and UIM coverage. We conclude that the legislative objective in compelling such protection is to compensate victims for bodily injury caused by negligent, financially irresponsible or underinsured motorists. Because punitive damages are not compensatory and are intended to punish and deter tortfeasors from wrongful conduct, we hold UIM and UM insurers are not liable to pay such damages unless they have specifically provided to do so. State Farm did not so contract. No reasonable expectation of the insured—nothing in the dickered deal, the nature of the transaction, or clear intent manifested in the policy language—militates in favor of finding such an undertaking.

The trial court's judgment that State Farm's UIM provisions covered punitive damages is reversed. The opinion in *State Farm Mutual Automobile Insurance Co. v. Wilson* as modified by this opinion is approved. The opinion of the court of appeals in *State Farm Fire & Casualty Co. v. Wise* is disapproved.

The case is remanded with instructions that judgment be entered in accordance with this opinion.

GORDON, C.J., and CAMERON, MOELLER and CORCORAN, JJ., concur.

and its purpose not furthered by payment of punitive damages); *Allen v. Simmons,* 533 A.2d 541, 544 (R.I.1987) (UM protection protects against compensatory damage only); *Burns v.* *Milwaukee Mut. Ins. Co.,* 121 Wis.2d 574, 360 N.W.2d 61 (Wis.App.1984) (recovery of punitive damages on an uninsured motorist claim against public policy).