796 P.2d 463

**PHOENIX CONTROL SYSTEMS, INC.,
a Wisconsin corporation, Petitioner,**

v.

**INSURANCE COMPANY OF NORTH
AMERICA, Respondent.**

No. CV–89–0158–PR.

Supreme Court of Arizona,
In Banc.

July 10, 1990.

**32**

Merl O. Barns and Alioto & Alioto by John I. Alioto, San Francisco, Cal., and Slater & Santaguida, P.C. by David B. Goldstein, Mesa, for petitioner.

Snell & Wilmer by Robert W. Haskin, Jr., and Eileen J. Moore, Phoenix, for respondent.

## OPINION

CAMERON, Justice.

### I. JURISDICTION

Phoenix Control Systems petitions this court for review of the decision of the court of appeals, *Phoenix Control Systems v. Insurance Company of North America,* 161 Ariz. 420, 778 P.2d 1316 (App.1989), which affirmed summary judgment in favor of Insurance Company of North America. We have jurisdiction under Ariz. Const. art 6., § 5(3) and A.R.S. § 12–120.24.

### II. QUESTIONS

1. Did the court of appeals err in finding, as a matter of law, that the insured's coverage for copyright infringement was limited to infringements that arose in the insured's advertising?

2. Did the court of appeals err in finding, as a matter of law, that the facts in the underlying action conclusively established that Phoenix Control Systems (PCS) acted intentionally and therefore relieved Insurance Company of North America (INA) of its obligation to defend?

### III. FACTS

The trial court granted summary judgment in favor of INA holding that INA had no duty to defend PCS in a civil action instituted by Johnson Controls, Inc. (Johnson) in the United States District Court for the District of Arizona. The Arizona Court of Appeals affirmed. Because summary judgment was granted in favor of INA, we view the facts in a light most favorable to PCS. *United Services Auto. Ass'n v. Morris,* 154 Ariz. 113, 114, 741 P.2d 246, 247 (1987).

PCS and Johnson are both engaged in the business of designing and selling industrial automated control systems, including computer programs and devices for the control of water and waste water treatment plants.

Each module of Johnson's software contains a proprietary statement that the computer program is Johnson's property, and that use without their written consent is prohibited. Johnson used its software to develop a computer program for process control at a waste water treatment plant on 91st Avenue in Phoenix. The JC–5000S water treatment program is a registered copyright of Johnson's, under the title "JC–5000 Process Control System".

John Schratz was an employee of Johnson's from April 1974 through December 1982 when he was fired. He then formed PCS and engaged in competition with Johnson.

Rodney Larsen was the project manager of the 91st Avenue project. He was a Johnson employee from 13 September 1976, through 4 January 1984. According to Johnson, Larsen was discharged because of his involvement in the preparation of the PCS Union Hills bid. Larsen then joined PCS.

Schratz allegedly intended to market the JC–5000S, or its functional equivalent, as a PCS product. Johnson sued PCS, Schratz, and Larsen in federal district court based on this and other actions PCS took allegedly to interfere with Johnson's business. *Johnson Controls Inc. v. Phoenix Control Systems, Inc.,* CIV. NO. 85–1084 PHX EH. In that suit Johnson alleged: 1) copyright infringement; 2) misappropriation of trade secrets; 3) interference with prospective contractual relations; and 4) injurious falsehood. Johnson sought damages as well as interlocutory and permanent injunc-

tive relief enjoining PCS from further engaging in the alleged illegal activities.[1]

Johnson's allegations were based on the following activities. First, in November 1983, Schratz, acting on behalf of PCS, wrote to the city engineer of the City of Fort Lauderdale, Florida that PCS wanted to compete for the contract to expand Fort Lauderdale's Lohmeyer plant. The letter stated that PCS had a contract to help implement the management information system at the 91st Avenue plant, and was therefore "in the unique position ... of being the only other potential vendor to qualify by experience, to expand the current Lohmeyer project hardware and software." The current water treatment program utilized at the Lohmeyer plant was installed by Johnson. Johnson planned to bid on the expansion contract as well.

Second, in December 1983, Schratz prepared a proposal for the Union Hills water treatment plant in Phoenix. The proposal stated that "the PC–850 ... is operating successfully at similar installations such as the City of Phoenix 91st Avenue waste water treatment plant...." Schratz testified in the federal district court action that this reference to the PC–850 was an attempt to make it appear that there was a standard PCS software system in place at the 91st Avenue plant, when, in fact, the JC–5000S was in place there.

During this time, PCS held a comprehensive property damage and liability insurance policy with INA. The policy provided that INA would defend PCS "in any lawsuits brought against you as the result of any activity covered by YOUR LIABILITY COVERAGE ..."

PCS requested that INA defend it in the federal court and INA refused. INA maintained that it had no duty to defend PCS in the Johnson action because the alleged copyright infringement did not occur in connection with advertising activity. INA also contended that PCS's activity fell within the policy's "intentional acts" exclusion.

## IV. APPLICATION OF THE LAST ANTECEDENT RULE

Liability claims covered under the INA insurance policy included *"bodily injury, personal injury,* or *property damage,* resulting from an *occurrence...."* (Emphasis in original). Personal injury was defined in eight separate categories:

* Mental suffering caused by the fact that someone was killed or suffered *bodily injury,* if the original injury or death was covered by this policy.

* Damage to someone's reputation or violation of someone's privacy caused by a publication or statement you or another *insured* make while this policy is in effect.

* False arrest, detention or imprisonment.

* Malicious prosecution.

* Wrongfully entering someone's home, business *premises,* or other property.

* Wrongfully evicting someone from his or her home, business *premises,* or other property.

* Any other wrongful invasion of someone's right of occupancy.

* *Any infringement of copyright or improper or unlawful use of slogans in your advertising.*

INA contends that the phrase "any infringement of copyright or improper or unlawful use of slogans in your advertising" means that PCS would be covered only if the "infringement of copyright" or "unlawful use of slogans" occurred in connection

---

1. On 12 November 1987, a preliminary injunction was entered by the district court enjoining PCS, among other things, from "reproducing, distributing, preparing derivatives of, or publishing and from representing that they have the ability to reproduce, distribute, prepare derivatives of, or publish plaintiff's computer program implemented at the Sacramento Regional Wastewater Treatment Plant, Southern Nevada Water Project, G.T. Lohmeyer Wastewater Treatment Plant, and the 91st Avenue Wastewater Treatment Plant (hereafter collectively referred to as the "JC–5000S"), or any program derived therefrom, or any portion thereof." PCS was also enjoined from employing former Johnson employees who worked on the JC–5000S. The injunction was granted, in part, based on findings made by a Special Master concerning the similarities between the Johnson JC–5000S and the PCS software. We will not set out those findings here as our inquiry is limited to the legal issues at hand.

with advertising activity. In other words, INA believes that "in your advertising" modifies *both* infringement of copyright and the unlawful use of slogans. Thus, from INA's perspective there is no coverage for infringement of copyright because PCS's actions were not in connection with advertising activity.

The court of appeals agreed with INA's reasoning, finding that each section of the personal injury list set forth in the policy covered only one occurrence. It would therefore create an anomaly to hold that one sentence explaining coverage included two occurrences.[2] Thus, the court of appeals held that "in your advertising" applied to modify both "infringement of copyright" and "improper or unlawful use of slogans."

PCS contends that the last antecedent doctrine should be applied to interpret "infringement of copyright" to include all forms of copyright infringement and not just that in connection with advertising.

 The last antecedent rule is recognized in Arizona and requires that a qualifying phrase be applied to the word or phrase immediately preceding as long as there is no contrary intent indicated. *Snyder v. Lena,* 145 Ariz. 583, 585–86, 703 P.2d 527, 529–530 (App.1985); *Tanner Companies v. Ariz. State Land Dept.,* 142 Ariz. 183, 189, 688 P.2d 1075, 1081 (App.1984) ("modifying phrase 'used as aggregate, . . . fill and for similar purposes' is limited to its last antecedent, 'materials of similar occurrence.' "); *Town of Florence v. Webb,* 40 Ariz. 60, 9 P.2d 413 (1932) (rule will not apply where its application would render the rest of the statute at issue merely surplusage, and where more important rules of construction, such as giving effect to every part of a statute, are applicable). The last antecedent rule is not inflexible and it will not be applied where the context or clear meaning of a word or phrase requires otherwise. As stated by Appleman in his treatise on insurance:

Qualifying words and phrases in an insurance contract ordinarily refer only to their immediately preceding antecedent. When a sentence contains several antecedents and several consequents, the words are applied to the subjects to which they seem most properly related by context and applicability.

*An insurance policy is not to be interpreted in a factual vacuum.*

13 Appleman, Insurance Law and Practice § 7383 at 8 (1989 Supp.).

 By applying the last antecedent rule, PCS asserts that "in your advertising" modifies only the words "improper or unlawful use of slogans", and does not modify "infringement of copyright." Thus, any form of copyright infringement would be covered and INA would have a duty to defend the federal district court action instituted by Johnson. We agree.

We will construe insurance contracts to protect the reasonable expectations of the insured. *See Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 389–90, 682 P.2d 388, 394–95 (1984). We believe that PCS, from reading the policy, could reasonably expect that all forms of copyright infringement would be covered, while coverage for the improper or unlawful use of slogans would be limited to that in connection with advertising activity. We believe that the context and clear meaning of the insurance policy does not require us to construe copyright infringement as limited to that in connection with advertising activity. Accordingly, we hold that infringement of copyright is covered by the policy.

## V. DID PCS ACT INTENTIONALLY?

Within the definition of occurrence, the policy excluded coverage for intentional injury or damage. "Occurrence" was defined as:

an *accident,* including continuous or repeated exposure to the same event, that results, during the policy period, in loss or damage to your property, or in bodily

---

**2.** We note that the second category of personal injury covered two occurrences; namely, dam-

ages to reputation and violation of privacy.

injury, personal injury, or property damage. Such injury or damage must be *neither expected nor intended by the insured.*

(Emphasis added.) "Accident" was defined in the policy as "a sudden, unforeseen, unintended event." Also excluded from coverage was personal injury resulting from deliberately false statements made about any person or business or its products or services.

PCS asked the trial court for declaratory relief, and moved for partial summary judgment. Schratz's affidavit in support of PCS's motion stated:

5. During the time period beginning on July 19, 1984 and ending on July 19, 1985, PCSI [Phoenix Control Systems, Inc.] made proposals to supply computer software and systems. In connection with preparing some of these proposals, PCSI operated on the premise that it could lawfully obtain certain software developed by Johnson Controls, Inc. because that software was developed as part of projects which received all or part of their funding from the United States Environmental Protection Agency. PCSI and I had been advised by Wally Quinn, a California attorney, that regulations of the Environmental Protection Agency allowed the owner of such a project, such as the City of Phoenix, for example, to use or disclose such software as it saw fit. I and the other officers of PCSI felt that we could obtain that software either from the Environmental Protection Agency or the project owner. *When we were not able to obtain any of that software through the Environmental Protection Agency we revised our proposals within a reasonable amount of time so that they would provide for different software that we could obtain lawfully or develop lawfully ourselves.*

6. None of the software provided by PCSI to a customer contains any material that is the subject of a valid copyright registered in the name of Johnson Controls, Inc., that is a derivative of such material, or that could be considered a trade secret of or proprietary information to Johnson Controls, Inc. *All of our software development has been independent.*

(Emphasis added). The trial court denied PCS's motion and granted summary judgment in favor of INA. The court of appeals found this affidavit dispositive of PCS's intent and held that INA was excused from defending under the intentional acts exclusion. In addition, the court of appeals found that although PCS acted under a mistake of law, the conduct was not "privileged" and thus did not enable PCS to avoid liability for its intentional acts.

■ Intentional act policy exclusions impose restrictions on insurance companies' contractual obligations not inconsistent with public policy. *Kepner v. Western Fire Ins. Co.*, 109 Ariz. 329, 330, 509 P.2d 222, 223 (1973). These exclusions are unique in that they impose restrictions upon insurance companies as well as on insureds. Public policy forbids indemnifying a person for his own wilful wrongdoing. *Transamerica Ins. Group v. Meere,* 143 Ariz. 351, 356, 694 P.2d 181, 186 (1984). For example, an insured may not be encouraged to shoot someone because he is "covered."

■ Determining whether an insured acts intentionally for purposes of insurance law is different than for purposes of tort law because there is no presumption in insurance law that a person intends the ordinary consequences of his actions. *Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 449, 675 P.2d 703, 709 (1983); *Vanguard Ins. Co. v. Cantrell*, 18 Ariz.App. 486, 503 P.2d 962 (1972).

■ A two-prong inquiry is applied in Arizona to determine an insured's intent. First, intent is determined by looking at the insured's subjective desire to cause harm. *See Vagnozzi*, 138 Ariz. at 449, 675 P.2d at 709; *Meere*, 143 Ariz. at 359, 694 P.2d at 189. An act, even though intentional, must be committed for the purpose of inflicting injury or harm:

[I]f the insured can show facts which might establish that he acted with privilege (as in a sports injury case, for instance) or under claim of right recog-

nized by law (as in self-defense), he will be permitted to explain his subjective intent, and it will be for the fact finder to determine whether he had an underlying purpose to injure.

*Meere,* 143 Ariz. at 358–59, 694 P.2d at 188–89. In the instant case, because the matter was disposed of by summary judgment, the fact-finder had no chance to hear testimony about Schratz' subjective intent. Second, if the nature and circumstances of the insured's intentional act were such that harm was substantially certain to result, intent may be inferred as a matter of law. *See Continental Ins. Co. v. McDaniel,* 160 Ariz. 183, 772 P.2d 6 (App.1988); *Steinmetz v. National American Ins. Co.,* 121 Ariz. 268, 589 P.2d 911 (App.1978); *Clark v. Allstate Ins. Co.,* 22 Ariz.App. 601, 529 P.2d 1195 (1975).

Specific cases where the insured's subjective intent has been examined include self defense (*Meere*), striking a blow in a basketball game in an attempt to get the basketball (*Vagnozzi*), firing a shot at a liquor store clerk merely to frighten him while escaping (*Vanguard*), intentionally injuring a burglar due to mistaken identity (*Curtain v. Aldrich,* 589 S.W.2d 61 (Mo. App.1979)), and where the insured acts intentionally but lacks the mental capacity to act rationally (*Globe American Cas. Co. v. Lyons,* 131 Ariz. 337, 339–40, 641 P.2d 251, 253–254 (App.1981)). The common thread in these cases is that the insured defendants did not have a primary desire to injure the victim. Instead, the actions in the above cases resulted from attempts by the insured defendants to prevent harm to themselves, instances where the defendants did not control the risks, cases where defendants injured another in a contact sport where the players assume some risks, or situations where the insured could not control his actions.

■ Courts may infer intent as a matter of law where an insured's actions are unprovoked and the primary desire is to injure the victim. For example, an insured is conclusively presumed to intend injury when he strikes another without provocation (*Steinmetz; Clark*), or when he sexually harasses an employee on the job and inflicts emotional distress. *McDaniel.*

Before a court may inquire into the insured's subjective intent, the facts must indicate that the insured was provoked, privileged, or justified in acting. Such an inquiry is particularly appropriate where the coverage in question is coverage for torts which essentially involve intentional acts that may cause injury. The coverage agreement in this case included indemnification for, among other things, personal injury, defamation, false arrest, and wrongful eviction, as well as copyright infringement. Many of these torts involve situations in which the act is done intentionally. For example, false imprisonment under the Restatement requires an *intent* to confine. Restatement (Second) of Torts § 35 (1965). Malicious prosecution requires "an intent to cause an arrest." *Id.* at § 37 comment b. In addition, the tort of trespass (covered under the fourth item of personal injury under the policy) requires an *intentional entry* onto the land of another. *Id.* at § 158. Although intent is not necessarily required for copyright infringement, (*see Pye v. Mitchell,* 574 F.2d 476, 481 (9th Cir.1978); 3 *Nimmer on Copyright* § 13.08 (1989)), an intentional act is often involved. Thus, if INA's intentional acts clause is applicable to such torts at all, the clause must be construed narrowly so that the exclusion for intentional acts does not totally eliminate the coverage for intentional torts.

■ In this case, the fact that the insured intended to use the copyrighted material should no more place his act under the intentional acts exclusion than if he intended to confine an individual and was later found to have acted wrongfully. The question must be, as it was in *Meere* and *Vagnozzi,* whether the insured intentionally acted wrongfully or whether his intentional act unintentionally resulted in wrongful conduct.

Schratz's affidavit indicated that he intended to use Johnson's proprietary information. However, Schratz also stated in the affidavit that he believed that he had the "legal right" to use the information

because it was in the public domain. This belief was based on advice of counsel. In addition, Schratz stated that when he realized he could not obtain the software through the United States Environmental Protection Agency (EPA) or the project owner "we revised our proposals within a reasonable amount of time so that they would provide for different software that we could obtain lawfully or develop lawfully ourselves."

The court of appeals concluded, based on this affidavit, that PCS acted purposely, that the entire promotion scheme was part of a conscious business decision within the company's control, and that PCS acted for its own economic advantage and not to avoid a calamity. The court focused on PCS's desire to advance its own economic position, and concluded that Schratz's mistaken belief about the legality of its actions was not privileged conduct preventing a finding that PCS acted intentionally as a matter of law. We do not agree.

We believe that whether PCS acted purposely with the intent to injure cannot be decided as a matter of law because PCS believed it had the right to compete with Johnson using materials it believed were in the public domain. PCS erroneously believed it could obtain the software lawfully under regulations of the EPA which favor the dissemination of pollution control technology when federal grants are involved. PCS relied on 40 C.F.R. § 30.525 (1981) for this position, and sought assistance from the City of Phoenix under the belief that the software could be lawfully obtained.[3]

Prior Arizona cases addressing intentional policy exclusions, have involved bodily injury or negligence and the focus was on whether the insured was in control of his or her behavior with respect to a specific event. See Meere, Vagnozzi. In this case, we have injury to economic interests based on ongoing business competition which the insured may have believed was legally permitted.

We do not believe this court or any court can conclude as a matter of law that PCS's promotion scheme was part of a conscious business decision to act wrongfully. Instead, we believe this case is similar to Vagnozzi, in which we held we held that intentionally throwing an elbow in an attempt to get the ball during a heated basketball game is distinguishable from deliberately punching a person in the face. Vagnozzi, 138 Ariz. at 450, 675 P.2d at 710. The facts in Vagnozzi were undisputed: the tortfeasor and the injured were playing a very physical basketball game when Arias intentionally elbowed Vagnozzi and knocked him to the ground. Although Arias, the tortfeasor, intended to hit Vagnozzi, different inferences could be drawn as to whether Arias intended to cause injury. We concluded that this was not an act so certain to result in a particular harm that summary judgment could be granted. Instead, the insured's subjective intent was a question of fact. Here, the parties were engaged in rigorous competition. Although Schratz admitted in his affidavit that he acted intentionally, Schratz also stated that he revised the proposals to provide for different software that could be lawfully obtained. Because conflicting inferences could be drawn as to whether or not PCS intended to cause harm to Johnson, the fact finder should have been given the opportunity to inquire into PCS's subjective intent and decide if the intent was to commit a wrongful act.

## IV. CONCLUSION

The last antecedent rule applies in this case, and PCS is thereby covered under the INA policy for all forms of copyright infringement.

PCS, in competing with Johnson, did not necessarily act wrongfully or with an un-

---

3. 40 C.F.R. § 30.525 (1981) reads:
 EPA's data policy is to expedite general utilization or further development of new or improved pollution prevention and abatement technology and procedures developed under EPA grants and fellowships. Therefore, it is most important that the results of EPA sponsored research include data that is sufficient to enable those skilled in the particular area to promptly utilize or further develop such technology and procedures. Availability of adequate data permits accurate assessment of the progress achieved under a grant or fellowship so that EPA priorities can be established. Access to data accumulated by the grantee shall be made available to the Project Officer on request.

lawful purpose to injure. Therefore, PCS's subjective intent is a question of fact, and summary judgment should not have been granted by the trial court.

## V. DISPOSITION

Reversed and remanded to the trial court for an inquiry into PCS's subjective intent.

GORDON, C.J., and MOELLER and CORCORAN, JJ., concur.

FELDMAN, Vice Chief Justice, specially concurring.

I concur in the court's opinion and in its conclusions. I write separately only because I believe the use of the doctrine of the last antecedent gives us no aid in interpreting the policy. We have recognized the limitations of this canon of construction when interpreting legislative acts. *See Town of S. Tucson v. Board of Supervisors,* 52 Ariz. 575, 584, 84 P.2d 581, 585 (1938) (clear intent of the legislature takes precedence as a canon of construction over all grammatical rules, particularly the doctrine of the last antecedent). I see no benefit and much harm in using the doctrine of the last antecedent in construing contracts. Reliance on such arcane, judicially adopted grammatical rules does not help us reach the intentions of the parties. Surely, even if the parties had bargained for the boilerplate language in this policy— something the record does not establish at all—it would be a fiction to pretend they drafted the language mindful that its meaning would be ascertained through use of the doctrine of the last antecedent.

The meaning of the policy is to be determined by the intent of the parties. *See State Farm Mut. Auto. Ins. Co. v. Wilson,* 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989); *Darner Motors Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984). Where, as here, we deal with a standardized policy and its boilerplate language, the parties had no meeting of the minds and their intentions are not evident. Therefore, *Darner* requires us to follow the plain meaning of the words of the boilerplate provision, unless we would have reason to believe the party assenting would not have done so if he knew the policy contained the term in question. 140 Ariz. at 391, 682 P.2d at 396 (*citing* Restatement (Second) of Contracts § 211).

In this case, however, the words have no plain meaning. The clause in question can be reasonably interpreted to have either the meaning advanced by the insured or that advanced by the insurer. In most cases, we should interpret it considering legislative or contract goals, social policy, and examination of the transaction as a whole. *Wilson.* None of those principles is applicable here because no statute applies and the nature of the transaction may be equally well served by either meaning. What we are left with, in other words, is simply a clause that can be as easily interpreted one way as the other. It is, in short, ambiguous. If ever the rule of ambiguity should apply, it is here, and the clause should be interpreted against the drafter. *See Wilson, Darner.*

I therefore concur in the court's interpretation of the clause but not in the reasoning of that portion of the opinion dealing with the last antecedent doctrine.