657 P.2d 917

**Judith DUNWELL and Phillip A. Matier, Plaintiffs/Appellees,**

v.

**UNIVERSITY OF ARIZONA, an educational institution of the State of Arizona; John Schaefer, President of University of Arizona; and the Arizona Board of Regents, a body corporate and an agency of the State of Arizona, Defendants/Appellants.**

**No. 2 CA–CIV 4407.**

Court of Appeals of Arizona,
Division 2.

Dec. 29, 1982.

Brown & Bain, P.A. by David J. Bodney, and Bonn, Muldoon & Luscher by Brian P. Muldoon, Phoenix, for plaintiffs/appellees.

Lesher, Clausen & Borodkin, P.C. by Robert O. Lesher and Robert M. Jarrett, Jr., Tucson, for defendants/appellants.

OPINION

HOWARD, Chief Judge.

This is an appeal from a judgment in a special action filed by appellees in the superior court pursuant to A.R.S. § 39–121.-02(A) which allows a person who has requested to examine or copy public records and who has been denied access to the same or the right to copy them to appeal the denial through a special action procedure in the superior court. The issues were joined and after a three-day trial and an in camera inspection of the requested documents, the trial court, after excising a handful of scandalous and irrelevant material, ordered appellants to release the documents.

Appellants complied with the order. Following their release the trial court heard evidence relating to attorney's fees and awarded appellees $17,378.50 in attorney's fees plus their costs. Appellants then filed this appeal contending that the trial court erred in requiring disclosure of the materials and erred in granting appellees their attorney's fees.

The record discloses that in July 1981, during the course of a criminal trial of former University of Arizona football coach Tony Mason, charges were made that contributions to the Wildcat Club, a booster organization, had been used for a hidden "slush fund" to provide financial assistance to student athletes and coaches. It was alleged that this fund was administered by the staff of the athletic department and was operated with the tacit approval of the director of athletics, David Strack. Since the existence of such fund might have been in violation of the rules and regulations of the NCAA and Pac-10 Conference, Dr. John Schaefer, president of the university, appointed an ad hoc committee to investigate the allegations. The committee consisted of Dr. Munsinger, a university vice-president who was being considered as a replacement for Dr. Schaefer; Richard Fish, a Tucson attorney; and Dr. Russell Barefield, chairman of the Department of Accounting at the university. The committee staff consisted of Dr. Munsinger's administrative assistant, Linda Tansik, John Monnier, a university assistant vice-president; and Robert M. Jarrett, a university staff attorney. The committee also hired two private investigators.

Once witnesses were located by the staff or by the private investigators, they were interviewed by the full committee. Each witness was read the following statement before he was interviewed by the full committee:

"This is not a criminal investigation. However, any statement you make *will not be held in confidence,* and it is not our intention to require you to answer any questions if you feel that the answer you would give would subject you to criminal prosecution. You may, if you choose, exercise your right against self-incrimination at any time." (Emphasis added)

The committee had resolved at its first meeting that it would not release any information to the press but only forward it to the president of the university. After the information was forwarded, the committee understood that it had no control over what the president did with the information.

All of the witness interviews were recorded in shorthand by Dr. Munsinger's administrative assistant, Linda Tansik. She then transcribed her shorthand into a question-and-answer format and distributed the interviews to the committee. Her typewritten reports were fair and accurate summaries of the testimony and there was not a single instance in which any substantive corrections were ever requested. The committee relied on Ms. Tansik's interview transcripts to prepare its report which was sent to President Schaefer. None of the witnesses who appeared before the committee requested a copy of the transcript of their interview to check it for accuracy or otherwise, nor did the committee require that the witnesses make such a check.

On November 3, 1981, the committee sent a nine-page summary of its findings to Dr. Schaefer, knowing that the report would be released publicly by him. None of the interview reports or background materials were forwarded to Dr. Schaefer.

The report included a brief description of some of the evidence in general terms and elaborated on the reasons that appellees and coaches tend to utilize improper funds. Concluding that "... disciplinary action would be procedurally inappropriate at this time ..." the committee's only recommendations were that a statement condemning such practices be added to the employee manual and that the university establish its own "emergency fund" for student athletes. The committee concluded that there was no evidence of any *on-going* slush fund in the athletic department.

On November 11, 1981, Dr. Schaefer publicly released the committee's report and announced that no disciplinary action would be taken against any university employee. At the trial, Dr. Schaefer admitted that he terminated the investigation on November 11 without seeing any of the transcripts of the witnesses' interviews or other background documents. He was prepared to issue a clean bill of health based only on the committee's report. It was also developed at the trial that members of the committee and its staff did not place in the report certain damaging information. For example, one of the chief controversies in the investigation was whether David Strack, the director of athletics, knew about the slush fund. The report states that "Mr. Daniel [the booster who administered the slush fund] has indicated that the director of athletics had a general knowledge of the fund but might well have been uninformed concerning the details of the operation." In fact, the record shows Mr. Daniel had been interviewed by the Arizona Daily Star and in that interview said that he had told the committee that Strack not only knew about the slush fund, but had ordered Daniel to "... burn the receipts."

Suspicions arose among people from the news media, including the appellees, reporters for the Arizona Daily Wildcat, the campus newspaper. For instance, the final report did not identify students who received improper payments or benefits from the fund. The report disregarded information that there was perhaps a second slush fund in operation and it made no mention of allegations that the tuition for certain student athletes was paid out of another improper fund. Furthermore although the slush fund existed at least until 1977, the only improper transactions that were specified in the report occurred in 1971 and 1972 which might have put such violations beyond the statutes of limitations as far as the NCAA was concerned thus precluding prosecution for NCAA violations. Further doubts about the reliability of the committee report were raised when the Daily Wildcat reported that some $10,000 to $20,000 reflected on slush fund receipts which had been turned over to the paper had not been accounted for in the committee's report.

After the release of the committee report to the public the suspicions which had been aroused were brought screaming to the surface when appellee Matier, acting on instructions from his editor Dunwell, went to Dr. Schaefer's office on November 13, 1981, to request the witness interview transcripts. Although Dr. Schaefer had not seen the transcripts he told Matier that, "... You can ask for them, but you're not going to get them." No explanation of the refusal was given by Dr. Schaefer except his declaration that the transcripts were not a matter of "... public record."

Matier immediately made a written request for the transcripts on a form provided by the university, but the only documents which were provided were the slush fund receipts, which were not requested. Appellees made a second written request for the documents on November 16, but no response was made and no explanation was given.

Appellees then retained counsel who made a third written demand for the documents on November 17. On November 23, Dr. Schaefer issued a press release in which he stated that there were no transcripts of interviews but merely "summaries ... [that] represent only the best memory and subjective interpretation of the writer", and the interviews were "... not given under oath and hearsay was freely admitted." Dr. Schaefer testified that this refusal was

based on the advice of legal counsel. However, Mr. Jarrett the legal advisor, testified that he had not in fact conducted a review of the documents to determine what documents or portions of documents might be defamatory and therefore arguably outside the scope of the public records access law.

On December 9, 1981, Dr. Schaefer gave another reason why the documents would not be released. He said that they would not be released because the witnesses were promised "confidentiality ... [and] that's an obligation I think we ought to keep."

At trial appellants asserted a different explanation of why the documents were not produced. They claim that they were withheld because their release would obviate the university's resistance to discovery of the same materials in an unrelated defamation litigation brought against the university by Tony Mason. Dr. Schaefer testified at trial that there were two reasons for his refusal to release the documents. The first was that compliance would destroy the university's ability to conduct investigations of misconduct and second, that it would be a party to the publication of defamatory material if it made such a release.

■ Appellants contend that the trial court erred in ordering production of documents and in granting attorney's fees to appellees. Appellees assert that the question of whether the documents should have been produced is moot since appellants complied with the court order by releasing the documents to the press. Furthermore, appellees contend that the trial court did not abuse its discretion in awarding attorney's fees. We agree with appellees on both issues.

■ In spite of the fact that the first issue is moot, appellants urge us to take jurisdiction because the issue involved is of great public importance and one which is likely to recur. It has long been the rule of this state that the appellate court is not empowered to decide moot questions or abstract propositions, or declare, for the sake of future cases, principles or rules of law which cannot affect the result of the instant issue. There is an exception to the foregoing rule. Where the matter is of considerable public importance or the principle involved is a continuing one, the appellate court may, in its discretion, decide the issues of law involved. *State v. Superior Court of Pima County,* 104 Ariz. 440, 454 P.2d 982 (1969).

While there is a great deal of public *interest* in this case since it involves the University of Arizona, a slush fund and the athletic department, we are unable to find any public *importance.* Appellants contend that it is of upmost importance that a body such as the University of Arizona know whether or not, when they conduct in-house investigations, they can withhold the statements made by witnesses before the investigating committee. They contend that without the ability to grant confidentiality, they will never be able to conduct any investigations. The problem with their contention is that it does not fit the facts here. The issue in this case was narrowed by the prefatory statement read to all witnesses which informed them that their statements would not be held in confidence. The issues, therefore, are peculiar to this case and are not of statewide public importance. Moreover, appellants have not cited to us any authority which gives them the right to grant confidentiality to witnesses in an in-house investigation.

We do not agree with appellants' contention that the problem would be recurring. Appellants were able to secure the testimony of enough witnesses to satisfy their investigation in spite of the fact that the witnesses were told that their statements would not be held in confidence. We cannot assume that this will happen again and that the investigating body will refuse to disclose statements made by witnesses when the body has told these witnesses the statements will not be held in confidence. We are also reluctant to decide this issue when it is appellants themselves who have made the issues moot. We therefore decline to rule on the merits of appellant's first contention.

As for the award of attorney's fees, A.R.S. § 39–121.02(B) states as follows:

508

"If the court determines that a person was wrongfully denied access to or the right to copy a public record and if the court finds that the custodian of such public record acted in bad faith, or in an arbitrary or capricious manner, the superior court may award to the petitioner legal costs, including reasonable attorney's fees, as determined by the court."

The trial court found that appellants acted in an arbitrary and capricious manner in denying access to the transcripts of the witnesses' testimony. Although the foregoing statute refers to "a public record" it is clear that it also applies to these transcripts which are "other matters" under A.R.S. § 39–121 which gives the public access to "other matters." In the case of *Church of Scientology v. City of Phoenix,* 122 Ariz. 338, 594 P.2d 1034 (App.1979) the court held that the proper way to view all requests for information is not to determine whether or not the record is technically a public record of other matter, but instead to determine if release of the information would have an important and harmful effect upon the official duties of the official or agency. Appellants contend here that they were justified in withholding the information because (1) it would have a harmful effect because they would not be able to conduct investigations in the future if witnesses knew that their statements would not be held in confidence; (2) that there was defamatory material contained in some of the statements, and (3) they acted under advice of counsel.

We believe that the trial court could well have concluded that the problem of future investigation being impeded by release of the materials was non-existent since the witnesses here were told that their statements would not be held in confidence; that an attempt should have been made by appellants to excise those statements which they thought were defamatory rather than a categorical denial of access; and that the defense of "advice of counsel" was not a magic shirt which when donned protected the wearer from all missles labeled "arbitrary and capricious conduct." In short, the trial judge could have legitimately concluded that the evidence compelled a conclusion that the reason appellants did not disclose the interview summaries was because such disclosure would have shown the report released to the press was inadequate and an attempt to "white wash" the university and was more in the nature of "damage control" than anything else. He could have concluded that appellants were "stonewalling it", hoping that the information would never have to be divulged not because of some compelling state interest but because it knew that if the press did see the interviews too many embarrassing questions would be asked.

Affirmed.

HATHAWAY and BIRDSALL, JJ., concur.