141 P.3d 794

**Jose Luis Gonzalez GAMEZ, Petitioner–Employee,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Thunderbird Furniture, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 05–0069.**

Court of Appeals of Arizona, Division 1, Department C.

Aug. 10, 2006.

Jose Luis Gonzalez Gamez aka Mario G. Lopez, Mesa, Petitioner in propria persona.

Laura L. McGrory, Chief Counsel, The Industrial Commission of Arizona By Suzanne Scheiner Marwil, Phoenix, Attorneys for Respondent.

James B. Stabler, Chief Counsel, State Compensation Fund By Bonnie E. Elber, Phoenix, Attorneys for Respondent Carrier & Employer.

Taylor & Associates, PLLC By Roger A. Schwartz, Phoenix, Attorneys for Amicus Cu-

sonal, Griffis and PNI did not; and the trial court did not conduct any such inspection despite offering to do so.

riae Arizona Association of Lawyers for Injured Workers (AALIW).

## OPINION

EHRLICH, Judge.

¶ 1 This is a special-action review of an Industrial Commission of Arizona ("Commission") award and decision upon review finding that Jose Luis Gonzalez Gamez (also known as Mario G. Lopez) is medically stationary with no permanent impairment. Gamez's issue is whether the award of the administrative law judge ("ALJ") is reasonably supported by the evidence. Because we find that the award and decision upon review are supported by the record, we affirm.

### FACTS [1] AND PROCEDURAL BACKGROUND

¶ 2 Gamez began working for Thunderbird Furniture on April 23, 2001, using the name and Social Security number of a Mario Lopez.[2] On June 19, 2001, he injured his lower back while lifting furniture in his capacity as a finisher for Thunderbird Furniture. He later developed pain in his neck, leg, right shoulder and right arm. Gamez later testified that he continued working for Thunderbird Furniture doing "light duty" until October 4, 2001, when he ceased working completely upon his doctor's recommendation.

¶ 3 Gamez's injury was treated with physical therapy, injections and medication. His claim for workers' compensation benefits was accepted by the State Compensation Fund ("SCF"). In February 2002, the SCF issued a notice of claim status terminating temporary compensation and medical benefits without permanent disability. Gamez protested, and he was awarded continuing medical benefits and temporary compensation.

¶ 4 In October 2003, Gamez was involved in an automobile accident that caused him to suffer increased pain in the areas affected by the industrial injury. Although he received three months of treatment after the accident, his pain did not lessen.

¶ 5 In December 2003, the SCF again issued a notice of claim status terminating medical benefits and temporary compensation without permanent disability, effective December 18, 2003. Gamez filed a request for hearing to protest the decision.

¶ 6 During the ensuing hearing, Gamez and two physicians testified.[3] The opinions of the two medical experts, Dr. Douglas Slaughter and Dr. James Maxwell, conflicted.

¶ 7 On April 1, 2005, the ALJ issued a decision upon hearing resolving the conflicting medical evidence by accepting the opinion of Dr. Maxwell. The ALJ found that Gamez's condition was stationary without permanent impairment as of December 18, 2003. Gamez was awarded medical, surgical and hospital benefits and temporary compensation from the date of his injury through the date he was found to be medically stationary.

¶ 8 On April 29, 2005, Gamez filed a request for review. On May 20, 2005, the ALJ issued a decision upon review affirming the ALJ's prior findings and award. Gamez timely filed a petition for special-action review by this court.

### DISCUSSION

¶ 9 Gamez argues that the ALJ erred in finding that he was not permanently disabled. He asserts that the conflicting medical evidence offered by Dr. Maxwell and Dr. Slaughter should have been resolved in his favor. We deferentially review the ALJ's factual findings, although we independently review the ALJ's legal conclusions. *See, e.g., PFS v. Indus. Comm'n*, 191 Ariz. 274, 277, 955 P.2d 30, 33 (App.1997). We will not set aside an award unless it cannot be supported by any reasonable theory of the evidence.

---

1. We review the evidence in the light most favorable to sustaining the ALJ's findings and award. *Salt River Project v. Indus. Comm'n*, 128 Ariz. 541, 544–45, 627 P.2d 692, 695–96 (1981).

2. Gamez is a 31–year–old male undocumented immigrant. He testified that he does not know Mario Lopez but that he used that name and a corresponding Social Security number in order to work in the United States. At least five Industrial Commission claims have been filed in the name Mario Lopez from June 1998 through November 2000. Gamez denied having filed any of those claims.

3. Gamez was represented by counsel during the hearings.

*Phelps v. Indus. Comm'n,* 155 Ariz. 501, 506, 747 P.2d 1200, 1205 (1987).

¶ 10 Dr. Slaughter is a board-eligible orthopedic surgeon. He treated Gamez approximately seven times from January 2002 through September 2003, conducted an orthopedic examination and reviewed plain films and an MRI report.

¶ 11 Dr. Slaughter observed a disk degeneration on the x-rays, stating that "the MRI report suggested a disk bulge at L5–S1 and an annular tear at L4–5." He evaluated Gamez as having an S1 distribution right lower extremity sciatica or radiculopathy, degenerative disk disease and an annular tear at L4–5. He found the industrial injury to be the cause of Gamez's injuries and symptoms because Gamez had stated that he had suffered no symptoms before the accident. Dr. Slaughter gave Gamez steroids for the pain in his legs, and he recommended intradiscal electrothermal therapy ("IDET") as well as epidural injections.

¶ 12 Gamez accepted epidural injections but refused IDET. Although he reported continued leg pain after the injections, Gamez continued to refuse IDET. On June 16, 2003, Dr. Slaughter designated Gamez as stationary with an 18 to 20% permanent impairment.

¶ 13 Dr. Maxwell, a board-certified orthopedic surgeon, examined Gamez and reviewed the MRI films. He found no annular tear, and he concluded that Gamez "had some mild desiccation at L5–S1 ... consistent [with] what a 25–year–old has." He determined that Gamez suffered from degenerative disk disease unrelated to the industrial injury.[4]

¶ 14 Dr. Maxwell concluded that Gamez was medically stationary as to the industrial injury because of the absence of any objective findings, the long history of Gamez's treatment and the diagnosis of degenerative disk disease. He further concluded that Gamez did not suffer any permanent impairment based on "the fact that there was nothing objective that [Maxwell] could identify." He disagreed with Dr. Slaughter's opinion that Gamez suffered from a lumbar radiculo-

pathy, and stated that his review of Dr. Slaughter's records and testimony did not support that conclusion. Dr. Maxwell added that Dr. Slaughter's reliance on an EMG was insufficient to support radiculopathy. Thus, he disagreed with Dr. Slaughter's impairment rating, concluding instead that Gamez "has a zero percent impairment" and that Gamez could work without restrictions.

¶ 15 The ALJ resolved the conflict by accepting the opinions of Dr. Maxwell "as being more well founded and correct." It is the ALJ's responsibility to resolve conflicts in the medical evidence, and we will not disturb that resolution unless it is "wholly unreasonable." *Ortega v. Indus. Comm'n,* 121 Ariz. 554, 557, 592 P.2d 388, 391 (App.1979) (citation omitted). Because this decision was not unfounded, we affirm the award.

## CONCLUSION

¶ 16 Because the ALJ's award and decision upon review are sufficiently supported by the evidence, we affirm.

CONCURRING: MAURICE PORTLEY, Presiding Judge.

BARKER, Judge, Special Concurrence.

¶ 17 Under our current legislative scheme, an undocumented immigrant is not an "employee" for purposes of the Arizona Workers' Compensation Act ("the Act"). Ariz.Rev. Stat. ("A.R.S.") § 23–901(6)(b) (Supp.2005). For this reason, I agree that the award denying benefits should be affirmed.

¶ 18 This particular case can be resolved based on the conflict in medical testimony described above. However, the issue of whether undocumented immigrants are entitled to worker's compensation benefits under the Act is presented by this case, has been fully briefed by the parties and the amicus, is a matter of significant public importance and is likely to recur. Additionally, the Industrial Commission is misapplying the statute. Under such circumstances, it is proper for this court to decide the issue. *See, e.g., London v. Broderick,* 206 Ariz. 490, 492, ¶ 7,

---

4. Dr. Maxwell stated that Gamez has some disk degeneration, adding that he did not know if it was there before the industrial injury. However,

he did not believe that, if the degeneration were pre-existing, it was aggravated by the injury.

80 P.3d 769, 771 (2003) (deciding a moot issue "because the issue it raises is important and . . . will likely recur."); *Big D Constr. v. Court of Appeals,* 163 Ariz. 560, 563, 789 P.2d 1061, 1064 (1990) ("We will consider cases that have become moot when significant questions of public importance are presented and are likely to recur."); *Fraternal Order of Police v. Phoenix Employee Relations Bd.,* 133 Ariz. 126, 127, 650 P.2d 428, 429 (1982) ("Our court has consistently held that it will refrain from considering moot or abstract questions. We will make an exception, however, to consider a question of great public importance or one which is likely to recur even though the question is presented in a moot case.") (citations omitted); *Dunwell v. Univ. of Arizona,* 134 Ariz. 504, 507, 657 P.2d 917, 920 (App.1982) (as to "moot questions . . . [w]here the matter is of considerable public importance and the principle involved is a continuing one, the appellate court may, in its discretion, decide the issues of law involved").

## I.

¶ 19 Gamez is a thirty-one year old male undocumented immigrant. Gamez entered the United States illegally. He used a false name, Mario Lopez, and Lopez's Social Security number when be began work for Thunderbird Furniture. Gamez was subsequently injured while working. He filed a workers' compensation claim under the name of Mario Lopez, and this action has thus far proceeded under the name of Mario Lopez. At least five Industrial Commission claims have been filed under the name Mario Lopez from June 1998 through November 2000. Gamez denies filing any of those claims.

¶ 20 In proceedings before the Industrial Commission it was undisputed that Gamez was not Lopez and that Gamez was an undocumented immigrant (or illegal alien) [5]:

Q. [By Fuller] Sir, you worked under a false name because legally you can't work in the United States; is that correct?

A. [By Gamez] That is correct.

Q. Sir, while you were working at Thunderbird Furniture, you were using the name Mario Lopez; is that right?

A. Yes.

Q. But it is your testimony here today that you are not Mario Lopez, is that right?

A. Yes.

Q. And do you know Mario Lopez?

A. No.

Q. You were just using that name and Mario Lopez' Social Security number for work purposes, weren't you?

A. Yes.

Q. That's because you're in the United States illegally; is that right?

A. That's correct.

¶ 21 As part of the claim under Lopez's name, Gamez was awarded temporary benefits but denied permanent benefits. The denial of permanent benefits was based on the ALJ's finding that there was no "permanent disability causally related to the subject industrial injury." Implicit in the Industrial Commission's award is that Gamez qualifies as an "employee" under A.R.S. § 23–901(6)(b).

¶ 22 This court requested that the parties brief the issue of whether Gamez, as an illegal alien, is legally an "employee" under the Act. The parties did so. We also permitted the Arizona Association of Lawyers for Injured Workers to file a brief in support of Gamez's position. The Industrial Commission itself also filed a separate brief. In its brief, the Industrial Commission confirms that it treats illegal aliens as "employees." As set forth below, an undocumented immigrant is not an employee within the meaning of A.R.S. § 23–901(6)(b). Accordingly, Gamez is not entitled to benefits.

## II.

¶ 23 The relevant portion of the Act defines "employee" to include:

Every person in the service of any employer subject to this chapter, including aliens and minors legally or illegally permitted to work for hire, but not including a person whose employment is both:

(i) Casual.

---

5. The terms "undocumented immigrant" and "illegal alien" are both used with the same meaning. The terms "illegal" and "alien" are statutory terms. A.R.S. § 23–901(6)(b).

(ii) Not in the usual course of the trade, business or occupation of the employer. A.R.S. § 23–901(6)(b). Although the entire definition is important, there are three critical passages in A.R.S. § 23–901(6)(b) that focus the inquiry. Are undocumented immigrants included within the phrase *"[e]very person* in the service of any employer subject to this chapter"? Are undocumented immigrants included by virtue of the phrase *"including aliens* and minors *legally or illegally permitted to work* for hire"? Does the exclusion of those persons "whose employment is both (i)[c]asual [and] (ii)[n]ot in the usual course of the trade" mean that undocumented immigrants are included by implication under the principle of *expressio unius?*

¶ 24 In answering these questions and determining the meaning of the statute, "we first look to the language of the statute itself. Our chief goal is to ascertain and give effect to the legislative intent." *Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin.*, 206 Ariz. 1, 5 ¶ 10, 75 P.3d 91, 95 (2003) (citation omitted); *accord City of Phoenix v. Superior Court (Derickson)*, 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984) ("The cardinal rule of statutory construction is to ascertain the meaning of the statute and intent of the legislature. . . ."). With limited exceptions, "if the language is clear and unambiguous, we apply it without using other means of statutory construction." *Calik v. Kongable*, 195 Ariz. 496, 498, ¶ 10, 990 P.2d 1055, 1057 (1999). However, if a "plain language" analysis is insufficient, we examine the broader range of factors. *Aros v. Beneficial Ariz., Inc.*, 194 Ariz. 62, 66, 977 P.2d 784, 788 (1999). Those factors include "the statute's policy, the evil it was designed to address, its words, context, subject matter, and effects and consequences." *Logan v. Forever Living Prods. Int'l, Inc.*, 203 Ariz. 191, 194 ¶ 10, 52 P.3d 760, 763 (2002).

### III.

### A.

¶ 25 The first phrase of A.R.S. § 23–901(6)(b) is very broad: *"Every* person in the service of any employer subject to this chapter." (Emphasis added.) There is no question that Gamez's employer, Thunderbird Furniture, is subject to the Act. If the statutory definition of "employee" in A.R.S. § 23–901(6)(b) stopped at this phrase, and there were no additional statutory provisions construing "employee," the court's inquiry might well cease—Gamez is clearly a person in the service of an employer. However, we are required to consider every phrase of the definition of "employee." *State v. Hoggatt*, 199 Ariz. 440, 444, ¶ 13, 18 P.3d 1239, 1243 (App.2001).

¶ 26 When construing a statute, "[w]e give words their usual and commonly understood meaning unless the legislature clearly intended a different meaning." *State v. Korzep*, 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). We must interpret the statute to give it a fair, reasonable, and sensible meaning. *Derickson*, 139 Ariz. at 178, 677 P.2d at 1286. Additionally, we must interpret the statute in such a way as to give effect to all of its language and not render any language ineffectual or meaningless. *Hoggatt*, 199 Ariz. at 444, ¶ 13, 18 P.3d at 1243.

¶ 27 First, if the phrase "[e]very person in the service of any employer" was intended to be construed without any limitation implicit in the statute, many of the definitions in A.R.S. § 23–901(6) would be superfluous because they would necessarily be included. *See* A.R.S. § 23–901(6)(a) (including state and local employees in the definition of "employee"); A.R.S. § 23–901(6)(c) (including lessees of mining property who perform work for a lessor who conducts the business and retains control in the definition of "employee"); A.R.S. § 23–901(6)(d) (including volunteer firemen "without full pay" in the definition of "employee"); A.R.S. § 23–901(6)(e) (including "members of the department of public safety reserve" in the definition of "employee"); A.R.S. § 23–901(6)(f) (including "any person placed in level three or four of the Arizona works program" in the definition of "employee"); A.R.S. § 23–901(6)(j) (including members of the Arizona state guard in the definition of "employee"); A.R.S. § 23–901(6)(k) (including part-time ambulance drivers without full pay in the definition of "employee"); A.R.S. § 23–901(6)(o) (including "[r]egular members of the Arizona game and fish department reserve" in the definition of "employee"); A.R.S. § 23–

901(6)(p) (including "[e]very person employed pursuant to a professional employer agreement" in the definition of "employee").

¶ 28 Second, as already referenced, A.R.S. § 23-901(6)(b) is modified by the phrase "including aliens and minors whether legally or illegally permitted to work." How this phrase modifies "[e]very person in the service of any employer" must be considered under the *expressio unius* rule.

¶ 29 *Expressio unius est exclusion alterius* is "a maxim of statutory interpretation meaning the expression of one thing is the exclusion of another." Black's Law Dictionary 581 (6th ed.1990); *see also In re Estate of Agans,* 196 Ariz. 367, 370 ¶ 16, 998 P.2d 449, 452 (App.1999) ("The expression of one or more items in a class generally indicates an intent to exclude all items of the same class that are not expressed."). Arizona courts, like that in *Ferrell v. Industrial Commission,* 79 Ariz. 278, 280, 288 P.2d 492, 494 (1955), have repeatedly used this canon of construction as a tool for determining legislative intent. *E.g. Sw. Iron & Steel Indus., Inc. v. State,* 123 Ariz. 78, 79-80, 597 P.2d 981, 982-83 (1979). Applying this canon to A.R.S. § 23-901(6)(b), it is evident that the legislature did not intend the definition of "employee" to apply generally to all employees illegally permitted to work for hire. Instead, the specific inclusion of the modification "legally or illegally permitted to work for hire" in the second phrase implicitly means that, other than the group or groups modified by this phrase, the legislative intent was to exclude all other groups "illegally permitted to work for hire." In *Ferrell,* the Arizona Supreme Court applied the *expressio unius* principle in this fashion. 79 Ariz. at 280, 288 P.2d at 494.

¶ 30 In *Ferrell,* the issue was whether claimant, a volunteer civil defense worker, was an employee of the State within the meaning of the Act. *Id.* at 279, 288 P.2d at 493. The relevant portion of the statute, which is now A.R.S. § 23-901(6)(a), defined "employee" to include, "[e]very person in the service of the state or of a county, city, town, municipal corporation or school district, including regular members of lawfully constituted police and fire departments of cities and towns, whether under election, appointment or contract of hire." *Id.* at 280, 288

P.2d at 494. Although the initial phrase, "[e]very person in the service of the state," could by its terms include a volunteer, the court found limits implicit in the remainder of the definition, "including regular members of lawfully constituted police and fire departments of cities and towns, whether under election, appointment or contract of hire." *Id.* at 280-81, 288 P.2d at 494. The court held that claimant was not a "person in the service of the state," noting the absence of any reference to "volunteer workers" connotes "a legal duty to do the acts being performed when ... injured" and reasoning that the phrase "contract of hire" requires "payment of some kind." *Id.* Further, the court applied the *expressio unius* rule to reject the argument that the claimant should be included in the definition of "employee" based on another provision specifically including volunteer firemen. *Id.* at 281-82, 288 P.2d at 494-95. The court explained: "The fact that the legislature saw fit *specifically to include volunteer firemen* within the limits of the Act would seem to indicate, under the *expressio unius* rule, that *the legislative intent was to exclude other groups* wherein no contract contemplating payment of wages existed." *Id.* (emphasis added).

¶ 31 Like *Ferrell,* we have in this case a worker's compensation statute that begins with the reference "*every person* in the service of...." A.R.S. § 23-901(b)(6) (emphasis added). Also, like *Ferrell,* that statutory language is then modified by a specific reference specifically "including" certain groups. Here the modifying phrase is "including aliens and minors legally or illegally permitted to work for hire." *Id.* Like *Ferrell,* with these two factors in place, "under the *expressio unius* rule, ... the legislative intent was to exclude other groups." Thus, only those illegal employees to whom the modifier "legally or illegally permitted to work for hire" applies are covered employees under the statutory definition set out in A.R.S. § 23-901(6)(b).

¶ 32 This reading is also consistent with the general rule that we must interpret a statute in a way that does not render any clause, sentence, or word superfluous, void, contradictory, or insignificant. *State ex rel.*

*Romley v. Johnson,* 196 Ariz. 52, 55 ¶ 11, 993 P.2d 453, 455 (App.1998). The modification "legally or illegally permitted to work for hire" would be superfluous if the statute generally applied to all employees illegally employed. If the legislature intended all persons illegally permitted to work for hire to be covered by workers' compensation, it would not have specifically included the modification in the limited sense in which it is used in the second phrase.

¶ 33 Thus, the reference to "[e]very employee" in A.R.S. § 23–901(6)(b) does not apply generally to workers illegally permitted to work for hire. It is modified by the second phrase "including aliens and minors legally or illegally permitted to work." Consequently, the inquiry now turns to the second phrase.

**B.**

¶ 34 On its face, the second phrase, "including aliens and minors legally or illegally permitted to work for hire," can be read two ways. It can be read so that the phrase "legally or illegally permitted to work" modifies both aliens and minors or just minors by itself. The rule of the last antecedent applies in this setting.

¶ 35 "The last antecedent rule is recognized in Arizona and requires that a qualifying phrase be applied to the word or phrase immediately preceding as long as there is no contrary intent indicated." *Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.,* 165 Ariz. 31, 34, 796 P.2d 463, 466 (1990); *see also* Black's Law Dictionary 882 (The last antecedent rule is "[a] canon of statutory construction that relative or qualifying words or phrases are to be applied to the words or phrases immediately preceding, and as not extending to or including other words, phrases, or clauses more remote[.]"). Accordingly, under a plain language analysis, the last antecedent rule provides that the modifier of "legally or illegally" only applies to "minors," and does not apply to "aliens," unless there is contrary legislative intent.

¶ 36 An examination of legislative intent as to this phrase is required. Fortunately, there is specific language from the legislature to indicate its intent in this regard. As the rule recognizes, the court has repeatedly held that clear legislative intent controls in

implementing this rule of construction. *S. Tucson v. Pima County,* 52 Ariz. 575, 584, 84 P.2d 581, 585 (1938) ("[T]he clear intent of the legislature takes precedence as a canon of construction of all grammatical rules, and particularly of [the rule of last antecedent].´"); *Fed. Mut. Liab. Ins. Co. v. Indus. Comm'n,* 31 Ariz. 224, 234, 252 P. 512, 515 (1926).

¶ 37 In discerning legislative intent, earlier versions of A.R.S. § 23–901(6)(b) are extremely helpful. Our cases hold that "[t]he intention of the legislature can be discovered by an examination of the development of the particular statute." *State v. Sweet,* 143 Ariz. 266, 271, 693 P.2d 921, 926 (1985); *accord Haas v. Colosi,* 202 Ariz. 56, 58 ¶ 6, 40 P.3d 1249, 1251 (App.2002). We should also examine how "the words of the statute were understood at the time the legislation was enacted." *Vo v. Superior Court (Romley),* 172 Ariz. 195, 200, 836 P.2d 408, 413 (App. 1992) (citing *Kriz v. Buckeye Petroleum Co.,* 145 Ariz. 374, 377, 701 P.2d 1182, 1185 (1985)).

¶ 38 Arizona Revised Statutes § 23–901(b), as originally enacted in 1925, applied

[to] workmen or operatives regularly in the same business ... under any contract of hire ... *including aliens, and also including minors who are legally or illegally permitted to work for hire under the laws of the state,* but not including any person whose employment is casual and is not in the usual course of trade, business or occupation of his employers.

Workmen's Compensation Law, ch. 83 § 45(2), 1925 Ariz. Sess. Laws 345, 370–71 (emphasis added). The comma separating "aliens" from "minors" and the conjunction "and also" makes it clear that the 1925 legislature intended "legally or illegally permitted to work for hire" to modify only "minors". *See id.* The modifier clearly did not apply to "aliens." The legislative intent is clear.

¶ 39 In 1928, the relevant portion of the statute was amended to read largely the same as in its present-day form. *Compare* A.R.S. § 1419 (1928) (current version at § 23–901(b) (Supp.2005)) *with* A.R.S. § 23–901(b) (Supp.2005). However, the Arizona Supreme Court has specifically held that the intent of the 1928 amendments was to shor-

ten the code—not to change the meaning: "It was the object of the code commissioner and the legislature in preparing the Revised Code of 1928 to change the legal meaning of the existing law as little as possible, but, as stated in the preface to the official edition of said Code, 'to reduce in language' and to avoid redundancy." *Ariz. Newspapers Assoc., Inc. v. Superior Court (Riddel),* 143 Ariz. 560, 563, 694 P.2d 1174, 1177 (1985); *see State ex rel. Bean v. Hardy,* 110 Ariz. 351, 353, 519 P.2d 50, 52 (1974) (same). Therefore, considering the rule of last antecedent in conjunction with the purpose of the 1928 amendment, it is clear that the legislature intended "legally or illegally permitted to work for hire" to modify only "minors" and not "aliens."

¶ 40 Because the legislature intended "legally or illegally permitted to work for hire" to modify only minors, specific legislative intent to affirmatively exclude illegal aliens is evidenced. As described above, *supra* ¶¶ 29–31, applying the *expressio unius* canon to the phrase at issue, the inclusion of the "legally or illegally" modification to "minors" without any such modification to "aliens" results in the exclusion of aliens "illegally permitted to work for hire." The prior code version makes this plain. Thus, applying the rules of construction establishes that the second phrase at issue does not include undocumented immigrants as "employees."

### C.

¶ 41 The third portion of the definition of "employee" in A.R.S. § 23–901(6)(b) excludes persons "whose employment is both: (i)[c]asual [and] (ii)[n]ot in the usual course of the trade, business or occupation of the employer."

¶ 42 Although the *expressio unius* rule could be read to include unauthorized aliens because they are not listed in the excluded circumstances, individual statute provisions must be construed in the context of the entire statute. *E.g., Burlington N. & Santa Fe Ry. Co. v. Ariz. Corp. Comm'n,* 198 Ariz. 604, 607, ¶ 15, 12 P.3d 1208, 1211 (App.2000). Additionally, specific language takes precedent over general. *Derickson,* 139 Ariz. at 178, 677 P.2d at 1286 ("[S]pecial or specific statutory provisions will usually control over those that are general."). The specific reference to "alien" and the exclusion of the modifier "legally or illegally" in the phrase just discussed take precedence over the general references to "[c]asual" and "[n]ot in the course of [employment]." Further, A.R.S. § 23–901(6)(b) excludes illegal aliens from the definition of "employee" before it lists other exclusions, making it unnecessary to include illegal aliens in the latter exclusions. *See Felix v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 986 P.2d 161, 164 (Wyo.1999).

¶ 43 Moreover, the "legally or illegally permitted to work for hire" modification to minors would be superfluous if the statute generally applied to illegal workers. As explained above, if the legislature intended all illegally employed persons to be covered by workers' compensation it would not have precisely stated that *minors* illegally permitted to work for hire are considered employees. *See id.* Thus, the third phrase at issue does not provide a basis to consider an undocumented immigrant to be an "employee" under § 23–901(6)(b).

### IV.

### A.

¶ 44 The Industrial Commission argues that illegal aliens are employees because the Act includes " 'aliens' without specifically excluding 'illegal' aliens" and the word alien "necessarily includes legal and illegal aliens." The Industrial Commission is correct insofar as it argues that the plain meaning of the word "alien," if the statutory modifiers were not present, includes legal and illegal aliens. This interpretation is also consistent with the historical usage of the word "alien." For example, the Immigration Act of 1924 defines alien to include "any individual not a native-born or naturalized citizen of the United States." *United States ex rel. Ulrich v. Kellogg,* 30 F.2d 984, 985 (D.C.Cir.1929) (quoting 8 U.S.C. § 224(b)). Further, while testifying before the House Immigration Committee in 1930, the Border Patrol used the word "alien" without regard to the legal or illegal status of the alien: "[W]herever they find an alien they stop him. If he is illegally in the country, they take him to headquarters."

Mae M. Ngai, *The Strange Career of the Illegal Alien: Immigration Restriction and Deportation in the United States, 1921–1965*, Law Hist. Rev. 69, 69–70 (2003) (quoting *Executive Session of the House Committee on Immigration and Naturalization* (Jan. 15, 1930)). Thus, when the word "alien" is used it may include both legal and illegal aliens or either one.

¶ 45 However, the Industrial Commission's reasoning that undocumented immigrants are included in the definition of "employee" simply because the word "alien" does not distinguish between legal and illegal immigrants is flawed. As discussed above, *supra* ¶ 35, the modifier "legally or illegally permitted to work for hire" applies only to minors based on the rule of the last antecedent and the lack of any contrary legislative intent. Applying the principle of *expressio unius*, as done in *Ferrell*, also results in excluding from the definition of "employee," "aliens" who are "illegally permitted to work for hire." *Supra* ¶¶ 29–31. The Industrial Commission's position also does not answer (1) the 1925 code version that makes plain the legislature's intent that "legally or illegally" modifies "minors" but does not modify "aliens," ("including aliens, and also including minors who are legally or illegally permitted to work for hire") *supra* ¶¶ 38–39, and (2) the Arizona Supreme Court cases holding that the statutory changes brought about by the 1928 code were intended "to change the legal meaning of the existing laws as little as possible." *Ariz. Newspapers*, 143 Ariz. at 563, 694 P.2d at 1177.

¶ 46 Accordingly, the Industrial Commission's argument that use of the word "alien" necessarily includes illegal aliens within the definition of "employee" is not well-taken.

### B.

¶ 47 It is also irrelevant under the Act that Congress did not pass a law making it unlawful for an *employer* to hire an illegal alien until 1986. *See* 8 U.S.C. § 1324(a) (2005).[6]

The United States Immigration Quota Acts of 1921 and 1924 made it illegal for an alien to enter the United States without proper documentation. Immigration Quota Act of 1921, ch. 8, 42 Stat. 5 (1923); Immigration Quota Act of 1924, ch. 190, 43 Stat. 153 (1925). Thus, while it was not generally illegal for an employer to hire an undocumented alien in 1925, it was illegal for an undocumented alien to remain and, therefore, to work within the United States. Just because there may be no legal consequence to the employer for hiring an undocumented immigrant does not mean that there are no legal restrictions on the undocumented immigrant. Arizona Revised Statutes § 23–901(6)(b) does not focus on whether the *employer* is legally permitted to hire the immigrant, but whether the *immigrant* is legally permitted to work for hire, i.e., whether there are legal restrictions on the immigrant. Moreover, even if there were no legal restrictions on an immigrant's employability in 1925, there are restrictions today.

### V.

¶ 48 Although the application of the foregoing statutory rules of construction to the plain language of A.R.S. § 23–901(6)(b) shows undocumented immigrants are not "employees," courts should read a statute as a whole: It must "be read and construed in the context of related provisions and in light of its place in the statutory scheme." *City of Phoenix v. Superior Court (Myers)*, 144 Ariz. 172, 176, 696 P.2d 724, 728 (App.1985). The court must also consider the "effects and consequences" of a particular statutory interpretation. *Logan*, 203 Ariz. at 194 ¶ 10, 52 P.3d at 763. Reviewing the remedies provided in the workers' compensation scheme in this light provides further indicia that the definition of "employee" in § 23–901(6)(b) was not intended to include illegal aliens.

¶ 49 For example, the average monthly wage for computing compensation benefits of

---

**6.** Even in the early 1900s, however, there were certain instances in which employers were penalized for hiring aliens not legally permitted to work for hire. In *Grant Brothers Construction Co. v. United States*, the Supreme Court of the Territory of Arizona upheld the conviction of a railroad contractor who was prosecuted and found guilty for inducing and soliciting unskilled laborers from Mexico in violation of federal law. 13 Ariz. 388, 114 P. 955 (Ariz.Terr.1911). In *State v. Davey*, the Arizona Supreme Court held that an employer could be prosecuted for employing aliens on municipal projects in violation of Arizona law. 27 Ariz. 254, 232 P. 884 (1925).

employees who are injured before working 30 days is determined by an amount that *"reasonably* represents the monthly earning capacity of the injured employee in the employment in which he is working at the time of the accident." A.R.S. § 23–1041(B) (Supp. 2005) (emphasis added). However, it would be unreasonable to include wages illegally obtained in an employee's capacity to earn money. The court would not, for instance, include income illegally earned by a trucker based on driving more hours than permitted under federal regulations. *See* 49 C.F.R. § 395.3 (2005). Moreover, it is also unreasonable to include wages that an illegal alien might legally obtain in his country of origin. Doing so would require a level of complexity not contemplated by the Act.

¶ 50 The calculation of temporary partial disability also supports a definition of "employee" that excludes illegal aliens. Compensation for temporary partial disability is two-thirds "of the difference between the wages earned before the injury and the wages which the injured person is able to earn thereafter." A.R.S. § 23–1044(A) (Supp.2005). However, regardless of the injury sustained, as a matter of law, illegal aliens are not "able to earn thereafter" because they cannot legally be employed. *See* 8 U.S.C. § 1324(a). Consequently, reading the inclusion of illegal aliens into the remedy scheme as currently provided would lead to absurd results. Because illegal aliens cannot legally have an ability to earn, their "wages earned before the injury" will not be reduced by an amount that they are "able to earn thereafter"—a benefit that is not "available to injured, legal workers in the same position but for the legality of their status in the United States." *Rivera v. United Masonry, Inc.*, 948 F.2d 774, 776 (D.C.Cir.1991).

¶ 51 Further, compensation for permanent partial disability is "fifty-five per cent of the difference between the employee's average monthly wages before the accident and the amount which represents the employee's reduced monthly earning capacity resulting from the disability." A.R.S. § 23–1044(C).

Earning capacity is determined by considering, among other things, the following:

[A]ny previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury, any wages received for work performed subsequent to the injury and the age of the employee at the time of injury.

A.R.S. § 23–1044(D). Nevertheless, employers are allowed to show that any "loss of earning capacity because of inability to obtain or retain suitable work ... is due, in whole or in part, to economic or business conditions, or other factors unrelated to the industrial injury." A.R.S. § 23–1044(G). Because inability to obtain work due to illegal status is a condition unrelated to the injury that prevents employment, employers would be able to preclude illegal aliens from permanent partial disability benefits. It seems unlikely that the legislature would have included this provision, without any exception, if it intended illegal aliens to receive permanent partial disability benefits. However, this effect highlights the problem of adopting a definition of "employee" that includes illegal aliens in the workers' compensation statute as currently written. It would be absurd to suppose that the legislature intended to provide illegal aliens a windfall for temporary partial disability and, at the same time, totally bar illegal aliens from receiving permanent partial disability.[7] Thus, the effects and consequences on the remedy scheme belie a definition of "employee" that was intended to include illegal aliens.

**VI.**

¶ 52 Courts also look to the policy behind a statute and the evil it was designed to remedy when ascertaining legislative intent. *See Salt R. Proj. Agr. Improvement & Pwr. Dist. v. Apache County*, 172 Ariz. 337, 342, 837 P.2d 139, 144 (1992); *Cohen v. State*, 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978). "The underlying purpose of the Workers' Compen-

7. Further, any person who receives workers' compensation benefits must be available to "submit himself for medical examinations from time to time" at a place reasonably convenient for the employee if requested. A.R.S. § 23–1026(A) (1995). This requirement seems to presuppose the ability of the employee to appear legally in the state.

sation Act ... is to compensate an employee for lost earning capacity and to prevent the injured employee and dependents from becoming public charges during the period of disability." *Mail Boxes etc. U.S.A. v. Indus. Comm'n,* 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995). As a rule of construction, "[a] remedial statute such as the Workmen's Compensation Act is to be construed liberally to effectuate its purpose in protecting its beneficiaries and compensating valid claims." *Fullen v. Indus. Comm'n,* 122 Ariz. 425, 429, 595 P.2d 657, 661 (1979).

¶ 53 While there is a general policy goal of compensating persons injured during employment, the objectives of compensating injured persons and reducing public dependency must be read together. The extent to which providing compensation awards to illegal aliens would further the goal of preventing injured employees and dependents from becoming public charges is limited because, other than emergency medical services, illegal aliens do not generally have a claim to public welfare assistance. *See* 42 U.S.C. § 1395dd (2003) (requiring hospitals with emergency room facilities to provide care for any individual who requests medical assistance); 8 U.S.C. § 1621(a) (2005) (providing that undocumented aliens are ineligible for most state and local benefits).[8]

¶ 54 Indeed, the legislature of this State has taken great efforts to eliminate discretionary benefits to undocumented immigrants. *See* A.R.S. § 23–781(B) (1995) (excluding illegal aliens from unemployment benefits); A.R.S. § 36–2903.03 (Supp.2005) (excluding illegal aliens from Arizona's Title XIX Medicaid program); A.R.S. § 46–233(A)(6) (2005) (making illegal aliens ineligible for general assistance).

¶ 55 More importantly, however, the examination of the development of the definition of "employee" discussed above shows that the legislature specifically intended to exclude illegal aliens from the workers' compensation scheme. *Supra* ¶¶ 37–39. General legislative goals must not be used to contravene specific legislative intent. *See Ariz. State Land Dep't v. R.H. Fulton, Inc.,* 118 Ariz. 404, 407, 577 P.2d 255, 258 (App.1978) ("[W]here a statute first expresses a general intent, and later an inconsistent particular intent, such particular intent will be taken as an exception to the general intent and both will stand."); *Shelby v. Action Scaffolding, Inc.,* 171 Ariz. 1, 5, 827 P.2d 462, 466 (1992), *superseded by statute on other grounds,* A.R.S. § 12–2506 (2003) (interpreting statute to achieve general legislative goals when specific intent unascertainable).

¶ 56 Finally, even if there were no specific legislative intent to exclude undocumented immigrants, the policy choice of including undocumented immigrants in the definition of "employee" requires affirmative legislative direction. "It is the sole prerogative of the legislature to specify the persons to be considered employees within the meaning of the Workmen's Compensation Act." *Ferrell,* 79 Ariz. at 282, 288 P.2d at 495. The legislature has been very involved in directing workers' compensation benefits, providing specific computations for minors, A.R.S. § 23–1042 (1995); members of volunteer fire departments, A.R.S. § 23–901(5)(d); members of the department of public safety reserve, A.R.S. § 23–901(5)(e); "[a]ny person placed in level three or four of the Arizona works program, in on-the-job evaluation or in on-the-job training under the department of economic security's temporary assistance for needy families program or vocational rehabilitation program," A.R.S. § 23–901(5)(f); members of a volunteer sheriff's reserve, A.R.S. § 23–901(5)(g); certain working members of a partnership, A.R.S. § 23–901(5)(h); certain sole proprietors of a business, A.R.S. § 23–901(5)(i); members of the Arizona national guard, A.R.S. § 23–901(5)(j); "[c]ertified ambulance drivers and attendants who serve without pay or without full pay on a

---

8. Section 1621(a) provides as follows:
   (a) In general
   Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not—
   (1) a qualified alien ...,
   (2) a nonimmigrant under the Immigration and Nationality Act ..., or

   (3) an alien who is paroled into the United States under section 212(d)(5) of such Act ... for less than one year,
   is not eligible for any State or local public benefit (as defined in subsection (c) of this section).

part-time basis," A.R.S. § 23–901(5)(k); "[v]olunteer workers of a licensed health care institution," A.R.S. 23–901(5)(*l* ); certain "[p]ersonnel who participate in a search or rescue operation or a search or rescue training operation," A.R.S. § 23–901(5)(m); certain "[p]ersonnel who participate in emergency management training, exercises or drills," A.R.S. § 23–901(5)(n); and "[r]egular members of the Arizona game and fish department reserve," A.R.S. § 23–901(5)(*o*).

¶ 57 Despite the clear practice of the legislature to specifically address unique concerns and provide detailed instructions concerning the allocation of workers' compensation benefits to these segments, the statute is void of any reference to illegal aliens except one that rules of construction and prior statutes show excludes them from benefits. This detailed involvement in other areas supports a conclusion that the legislature did not intend to include undocumented immigrants as employees by this reference.

¶ 58 Illegal immigration is a topic of intense social and political debate. *See, e.g.,* Mike Allen, *A Compromise on Immigration,* Time, March 23, 2006, *available at http://www.time.com/time/nation/article/0,8599,1196991,00.html* (discussing the debate in Congress over the guest worker program proposed for illegal immigrants); *Immigration Issue Draws Thousands into Streets,* MSNBC, March 25, 2006, *available at* http://www.msnbc.msn.com/id/11442705 ("Police said more than 500,000 people marched … to protest a proposed federal crackdown on illegal immigration."); *More Immigrants Take to Streets to Protest Proposed Laws,* Fox News, April 11, 2006, *available at* http://www.foxnews.com/story/0,2933,191142,00.html ("As many as 100 cities across the country served as hosts … to rallies and protests against any get-tough measures federal lawmakers are considering to crack down on illegal immigration."). There are strong policy reasons for compensating injured immigrants who are illegally employed—but there are also strong policy reasons for excluding undocumented immigrants from the workers' compensation scheme. *See, e.g.,* Jason Schumann, Note,

*Working the Shadows: Illegal Aliens' Entitlement to State Workers' Compensation,* 89 Iowa L.Rev. 709, 732–37 (2004) (stating the inclusion of "unlawfully employed aliens" within the definition of "employee" for workers' compensation coverage "would be in harmony with federal immigration policy as expressed in the United States Supreme Court's decisions regarding federal labor laws"); Jill Cohen Walker, *Illegal Immigration and Workers' Comp,* A Conservative Voice, February 2, 2006, *available at* http://www.theconservativevoice.com/article/12034.html ("Judges don't tell the plaintiffs [seeking workers' compensation] they have no standing because they aren't here lawfully and can't work here lawfully. They bypass the real issues in violation of laws promulgated to protect 'we the people.' "). Moreover, a decision to include illegal aliens within the Act also necessitates a policy choice regarding the allocation of benefits in a way that anticipates the unique concerns raised by this group's inclusion.[9]

¶ 59 The question of whether the statutory definition of "employee" in the Act should be broadened to include undocumented immigrants is for the legislature and requires a comprehensive approach. Important policy decisions, outside a statute's terms, are "best handled by legislatures with their comprehensive machinery for public input and debate." *Winsor v. Glasswerks PHX, L.L.C.,* 204 Ariz. 303, 310, ¶ 24, 63 P.3d 1040, 1047 (App.2003) (quoting *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 441 (7th Cir.1977)).

## VII.

¶ 60 As set forth above, the legislature has not provided that an undocumented immigrant is an "employee" under the Act. A.R.S. § 23–901(6)(b). For that reason, the award denying benefits in this matter is appropriate.

---

9. Until the legislature clarifies which, if any, benefits are provided to illegal aliens, it is not necessary to address the issue of federal preemption.

*See Hoffman Plastic Compounds, Inc. v. N.L.R.B.,* 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002).